OPINIONS OF THE SUPREME COURT OF OHIO
The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Justine Michael, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Hill, Appellant.

[Cite as State v. Hill (1992),     Ohio St.3d     .]

Criminal law -- Aggravated murder -- Death penalty upheld, when.

(No. 90-177 -- Submitted April 8, 1992 -- Decided August
12, 1992.)

Appeal from the Court of Appeals for Trumbull County, Nos.
3720 and 3745.

On September 10, 1985, at approximately 5:15 p.m.,
twelve-year-old Raymond Fife left home on his bicycle to visit
a friend, Billy Simmons.  According to Billy, Raymond would
usually get to Billy's residence by cutting through the wooded
field with bicycle paths located behind the Valu-King store on
Palmyra Road in Warren.

Matthew Hunter, a Warren Western Reserve High School
student, testified that he went to the Valu-King on the date in
question with his brother and sister shortly after 5:00 p.m.
Upon reaching the front of the Valu-King, Hunter saw Tim Combs
and defendant-appellant, Danny Lee Hill, walking in the parking
lot towards the store.  After purchasing some items in the
Valu-King, Hunter observed defendant and Combs standing in
front of a nearby laundromat.  Combs greeted Hunter as he
walked by.  Hunter also saw Raymond Fife at that time riding
his bike into the Valu-King parking lot.

Darren Ball, another student at the high school, testified
that he and Troy Cree left football practice at approximately
5:15 p.m. on September 10, and walked down Willow Street to a
trail in the field located behind the Valu-King.  Ball
testified that he and Cree saw Combs on the trail walking in
the opposite direction from the Valu-King.  Upon reaching the
edge of the trail close to the Valu-King, Ball heard a child's
scream, "like somebody needed help or something."

Yet another student from the high school, Donald E.
Allgood, testified that he and a friend were walking in the
vicinity of the wooded field behind the Valu-King between 5:30
p.m. and 6:00 p.m. on the date in question.  Allgood noticed
defendant, Combs and two other persons "walking out of the
field coming from Valu-King,"  and saw defendant throw a stick
back into the woods.  Allgood also observed Combs pull up the
zipper of his blue jeans.  Combs "put his head down" when he

saw Allgood.

At approximately 5:50 p.m. on the date in question, Simmons called the Fife residence to find out where Raymond was. Simmons then rode his bicycle to the Fifes' house around 6:10 p.m. When it was apparent that Raymond Fife's whereabouts were unknown, Simmons continued on to a Boy Scouts meeting, while members of the Fife family began searching for Raymond.

At approximately 9:30 p.m., Mr. Fife found his son in the wooded field behind the Valu-King. Raymond was naked and appeared to have been severely beaten and burnt in the face. One of the medics on the scene testified that Raymond's groin was swollen and bruised, and that it appeared that his rectum had been torn. Raymond's underwear was found tied around his neck and appeared to have been lit on fire.

Raymond died in the hospital two days later. The coroner ruled Raymond's death a homicide. The cause of death was found to be cardiorespiratory arrest secondary to asphyxiation, subdural hematoma and multiple trauma. The coroner testified that the victim had been choked and had a hemorrhage in his brain, which normally occurs after trauma or injury to the brain. The coroner also testified that the victim sustained multiple burns, damage to his rectal-bladder area and bite marks on his penis. The doctor who performed the autopsy testified that the victim sustained numerous external injuries and abrasions, and had a ligature mark around his neck. The doctor also noticed profuse bleeding from the victim's rectal area, and testified that the victim had been impaled with an object that had been inserted through the anus, and penetrated through the rectum into the urinary bladder.

On September 12, 1985, defendant went downtown to the Warren Police Station to inquire about a $5,000 reward that was being offered for information concerning the murder of Raymond Fife. Defendant met with Sergeant Thomas W. Stewart of the Warren Police Department and told him that he had "just seen Reecie Lowery riding the boy's bike who was beat up." When Stewart asked defendant how he knew the bike he saw was the victim's bike, defendant replied, "I know it is." Defendant then told Stewart, "If you don't go out and get the bike now, maybe [Lowery will] put it back in the field." According to Stewart, the defendant then stated that he had seen Lowery and Andre McCain coming through the field at around 1:00 that morning. In the summary of his interview with defendant, Stewart noted that defendant "knew a lot about the bike and about the underwear around the [victim's] neck." Also, when Stewart asked defendant if he knew Tim Combs, defendant replied, "Yeah, I know Tim Combs. *** I ain't seen him since he's been out of the joint. He like boys. He could have done it too."

On September 13, 1985, the day after Stewart's interview with defendant, Sergeant Dennis Steinbeck of the Warren Police Department read Stewart's summary of the interview, and then went to defendant's home and asked him to come to the police station to make a statement. Defendant voluntarily went to the police station with Steinbeck, whereupon defendant was advised of his Miranda rights and signed a waiver-of-rights form. Defendant made a statement that was transcribed by Steinbeck, but the sergeant forgot to have defendant sign the statement.

Subsequently, Steinbeck discovered that some eyewitnesses had seen defendant at the Valu-King on the day of the murder.

On the following Monday, September 16, Steinbeck went to defendant's house accompanied by defendant's uncle, Detective Morris Hill of the Warren Police Department. Defendant again went voluntarily to the police station, as did his mother. Defendant was given his Miranda rights, which he waived at that time as well. After further questioning by Sergeants Stewart and Steinbeck and Detective Hill, defendant indicated that he wanted to be alone with his uncle, Detective Hill. Several minutes later, defendant stated to Hill that he was "in the field behind Valu-King when the young Fife boy got murdered."

Defendant was given and waived his Miranda rights again, and then made two more voluntary statements, one on audiotape and the other on videotape. In both statements, defendant admitted that he was present during the beating and sexual assault of Raymond Fife, but that Combs did everything to the victim. Defendant stated that he saw Combs knock the victim off his bike, hold the victim in some sort of headlock, and throw him onto the bike several times. Defendant further stated that he saw Combs rape the victim anally and kick him in the head. Defendant stated that Combs pulled on the victim's penis to the point where defendant assumed Combs had pulled it off. Defendant related that Combs then took something like a broken broomstick and jammed it into the victim's rectum. Defendant also stated that Combs choked the victim and burnt him with lighter fluid. While defendant never admitted any direct involvement in the murder, he did admit that he stayed with the victim while Combs left the area of the attack to get the broomstick and the lighter fluid used to burn the victim.

Upon further investigation by authorites, defendant was indicted on counts of kidnapping, rape, aggravated arson, felonious sexual penetration, aggravated robbery and aggravated murder with specifications.

On December 16, 1985, a pretrial hearing was held on defendant's motion to suppress statements made to police officers both orally and on tape. On January 17, 1986, the court of common pleas concluded as follows:

"It is the opinion of this Court that no Fourth Amendment violation was shown because [defendant] was at no time 'seized' by the police department, but rather came in either voluntarily, or as in the case of September 16th because of his mother's demands.

"***

"Defendant's Fifth Amendment Rights were clearly protected by the numerous Miranda Warnings and waivers. Though this Court believes that the defendant could not have effectively read the rights or waiver forms, the Court relies on the fact that at any time he was given a piece of paper to sign acknowledging receipt of the Miranda Warnings and waiving his rights, the paper was always read to him before he affixed any of his signatures.

"Though defendant is retarded, he is not so seriously impaired as to have been incapable of voluntarily and knowingly given the statements which the defendant now seeks to suppress. The Court reaches this conclusion after seeing and listening to the defendant at the Suppression Hearing and

listening to and watching the tape recording and videotaped statements of the defendant. The Court concludes that the statements were made voluntarily, willingly, and knowingly."

Meanwhile, on January 7, 1986, defendant appeared before the trial court and executed a waiver of his right to a jury trial.

On January 21, 1986, defendant's trial began in front of a three-judge panel. Among the voluminous testimony from witnesses and the numerous exhibits, the following evidence was adduced:

Defendant's brother, Raymond L. Vaughn, testified that he saw defendant wash his gray pants on the night of the murder as well as on the following two days. Vaughn identified the pants in court, and testified that it looked like defendant was washing out "something red. *** It looked like blood to me ***."

Detective Sergeant William Carnahan of the Warren Police Department testified that on September 15, 1985 he went with eyewitness Donald Allgood to the place where Allgood stated he had seen defendant and Combs coming out of the wooded field, and where he had seen defendant toss "something" into the woods. Carnahan testified that he returned to the area with workers from the Warren Parks Department, and that he and Detective James Teeple found a stick about six feet from the path where Allgood saw defendant and Combs walking.

Dr. Curtis Mertz, a forensic odontologist, stated that: "It's my professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that I had, made the bite on Fife's penis."

The defense called its own forensic odontologist, Dr. Lowell Levine, who stated that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis. However, Levine concluded: "What I'm saying is either Hill or Combs, or both, could have left some of the marks but the one mark that's consistent with the particular area most likely was left by Hill."

Doctor Howard Adelman, the pathologist who performed the autopsy of the victim's body, testified that the size and shape of the point of the stick found by Detective Carnahan was "very compatible" with the size and shape of the opening through the victim's rectum. Adelman described the fit of the stick in the victim's rectum as "very similar to a key in a lock."

At the close of trial, the trial panel deliberated for five hours and unanimously found defendant guilty on all counts, except the aggravated robbery count and the specification of aggravated robbery to the aggravated murder count.

Pursuant to R.C. 2929.04(B), a mitigation hearing was held by the three-judge panel beginning on February 26, 1986. The panel received testimony, and thereafter weighed the aggravating circumstances against the mitigating factors. The panel then sentenced defendant to ten to twenty-five years' imprisonment  for both aggravated arson and kidnapping, life imprisonment for rape and felonious sexual penetration, and the death penalty for aggravated murder with specifications.1

Upon appeal, the court of appeals affirmed the panel's judgment of conviction and sentence.

The cause is now before this court upon an appeal as of

right.

Dennis Watkins, Prosecuting Attorney, and Peter J. Kontos, for appellee.

Tataru, Wallace & Warner and Roger Warner; Tyack, Wright & Turner and Carol A. Wright, for appellant.

Sweeney, J.    Pursuant to R.C. 2929.05(A), this court is required to undertake a three-prong analysis in reviewing the instant death penalty case.  First, we will consider the specific issues raised by defendant with respect to the proceedings below.  We will review all of defendant's propositions of law, even though some may be deemed to have been waived since they were not raised below.  Second, we will independently weigh the aggravating circumstances in this case against all factors which mitigate against the imposition of the death sentence.  Third, we will independently consider whether defendant's sentence is appropriate disproportionate to the penalty imposed in similar cases.

In his first proposition of law, defendant contends that his Sixth and Fourteenth Amendment right to counsel was violated because he was deprived of counsel during custodial interrogation.  Defendant further contends that he could not waive his right to counsel and that his statements to the police were not voluntary since he is mentally retarded.

With respect to waiver, the United States Supreme Court in Colorado v. Connelly (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, reaffirmed its prior holding in Lego v. Twomey (1972), 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed. 618, that the state carries the burden of proving the voluntariness of a confession by a preponderance of the evidence.  However, Connelly also holds that evidence of police coercion or overreaching is necessary for a finding of involuntariness, and not simply evidence of a low mental aptitude of the interrogee.  Id., 479 U.S. at 164, 107 S.Ct. at 520, 93 L.Ed.2d at 482-483; see State v. Clark (1988), 38 Ohio St.3d 252, 527 N.E.2d 844. See, also, United States v. Young (E.D.Pa. 1973), 355 F.Supp. 103, where the court held that a defendant with an IQ of 57 could voluntarily waive his Miranda rights due to his "extensive dealings with the criminal process."  Id. at 111.

The record herein indicates that defendant made a statement to Sergeant Steinbeck after waiving his Miranda rights, but that Steinbeck apparently forgot to have defendant sign his transcribed statement.  Subsequently, Steinbeck and Detective Hill went to defendant's home to have him sign the statement and have his mother make a statement concerning defendant's whereabouts on the day of the Fife murder.  Defendant and his mother voluntarily went to the police station with the officers where he was again given his Miranda rights before and during the time he made some incriminating statements to the police officers concerning his presence at the murder.

In our view, defendant's arguments are without merit.  Upon a careful review of the record, we can discern no coercive or overreaching tactics employed by the police during questioning.  Based on Connelly, supra, this court's ruling in State v. Jenkins (1984), 15 Ohio St.3d 164, 233, 15 OBR 311,

370-371, 473 N.E.2d 264, 321-322, and his prior dealings with the criminal process as a juvenile, defendant's mental aptitude did not undercut the voluntariness of his statements or his waiver of Miranda rights. Accordingly, we overrule defendant's first proposition of law.

In his second proposition of law, defendant asserts that his statements to the Warren police officers were not voluntary since the statements were the result of psychological tactics employed by the police on a retarded individual who is essentially illiterate. Defendant contends that the admission of such statements violates the Due Process Clauses of both the United States and Ohio Constitutions.

Defendant's arguments in this respect are based on his relationship with his uncle, Morris Hill, a detective with the Warren Police Department. Detective Hill testified that prior to defendant's reaching the age of eighteen, he would at times physically discipline defendant at the request of defendant's mother.

A review of the record indicates that immediately prior to defendant's first admission that he was present at the murder of the victim, he was left alone with Detective Hill. Shortly thereafter, Detective Hill summoned the other interrogating police officers and stated that defendant was going to tell what he knew about the murder. Defendant testified at the suppression hearing that Detective Hill kicked him under the table in order to make him start talking when the officers began to tape his statement. Defendant argues that taking into account the totality of circumstances, it is apparent that the tape-recorded statement and the videotape statement were involuntary, especially when one considers the psychological ploy used by the police on him, a retarded individual, that another person (Tim Combs) was going to blame him for the murder.

Upon a careful review of the testimony and the audiotape and videotape statements, we do not find that the interrogation tactics used by the police officers, even in light of defendant's mental capacity, rendered the statements involuntary, or that the officers improperly induced the defendant to make incriminating statements. In State v. Jackson (1977), 50 Ohio St.2d 253, 4 O.O.3d 429, 364 N.E.2d 236, this court upheld a confession that ensued after detectives told a suspect that others had implicated him in the commission of a criminal offense.

In our view, the trial court correctly determined that the statements made by defendant were voluntary. Therefore, we find defendant's second proposition of law to be without merit.

In his third proposition of law, defendant argues that the state failed to establish that he was properly given his Miranda rights, or that he knowingly, voluntarily and intelligently waived such rights.

Contrary to defendant's arguments, the record amply supports the fact that defendant was given his Miranda rights several times, and that during each of these times such rights were knowingly, voluntarily and intelligently waived by defendant. See Young, supra. Thus, we find defendant's third proposition of law to be not well taken.

In his fourth proposition of law, defendant asserts that

his Fourth and Fourteenth Amendment rights were violated when he was seized from his home through the use of psychological ploys by the police officers.

Our review of the record, however, indicates that defendant voluntarily went with the police officers to the police station at the urging of his mother. Defendant was not taken into custody at the time the police officers brought him to the police station; the police had come to his home to try to get him to go to the police station to sign the prior statement he had made to Sergeant Steinbeck. The officers also wanted to get a statement from defendant's mother concerning defendant's whereabouts on the day of the Fife murder. In addition, defendant indicates on the audiotape made on September 16, 1985 that he was not under arrest when he went to the police station and that he gave his statment voluntarily.

Under these circumstances, we find defendant's fourth proposition of law to be wholly without merit.

In his fifth proposition of law, defendant contends that he was denied his right to due process when he was denied his statutory right to counsel pursuant to R.C. 120.16, 2935.14 and 2935.20.

We cannot, however, find any evidence supporting defendant's contention that he was denied his right to counsel. The record indicates that that at no time did defendant ever request an attorney. While it is true that defendant's mother, Vera Williams, testified that she asked her brother, Detective Hill, if she should hire an attorney, and he told her that it would not be necessary since an appointed attorney would be assigned to the defendant, there is no credible evidence in the record that defendant ever invoked his right to counsel either before or during the times he talked to the police officers. In addition, defendant was not under arrest at the time in question and had come voluntarily to the police station.

As this court noted in State v. Benner (1988), 40 Ohio St.3d 301, 310, 533 N.E.2d 701, 711-712, in the context of Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, a person must affirmatively articulate a request for counsel in order for the right to attach during interrogation. See United States v. Pearson (C.A.11, 1984), 746 F.2d 787, 793.

Even assuming, arguendo, that defendant's statements should have been suppressed, the other evidence in the instant cause is so overwhelming as to render any error harmless beyond a reasonable doubt. Accordingly, we reject defendant's fifth proposition of law.

In his sixth proposition of law, defendant alleges that the police failed to comply with R.C. 2935.05,2 and that his arrest was therefore illegal, and any statements derived therefrom must be suppressed.

The record indicates that defendant was arrested on September 16, 1985, and that charges were filed the very next day. In our view, defendant's argument of unnecessary delay is wholly unpersuasive. Even if we were to find that the alleged delay was unnecessary and violated the statute, the statutory violation would not compel suppression of the statements in the absence of any constitutional infringement. See State v.

Cowans (1967), 10 Ohio St.2d 96, 39 O.O.2d 97, 227 N.E.2d 201. Therefore, we overrule defendant's sixth proposition of law.

In his seventh proposition of law, defendant asserts that the statements he gave to the police officers were made under the impression that he would receive leniency or some other benefit. Inasmuch as he received no leniency, defendant argues that the statements made should be inadmissible in any later trial.

In our view, defendant's argument is without support. The record is totally devoid of anything that could be remotely characterized as a plea-bargain arrangement between defendant and the police officers. Accordingly, we summarily overrule defendant's seventh proposition of law.

In his eighth proposition of law, defendant contends that trial court committed prejudicial error by admitting into evidence other crimes, wrongs or acts committed by defendant. Defendant submits that in so doing, the trial court violated R.C. 2945.59, Evid.R. 404(B) and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

The error complained of in this vein involves the testimony of three witnesses for the prosecution. Candyce S. Jenkins testified that in March 1984, defendant went to her house, broke a window with his fist, and entered the premises carrying a knife. Jenkins stated that defendant raped her twice anally, once vaginally, and made her perform fellatio on him.

Jenkins further testified that defendant bit her on the back and on the breast during the rape, and told her that he was going to stick the knife up her rectum, cut out her vagina and cut off her breasts. Jenkins also stated that defendant threatened to rape her baby, who was in another room in the house, and cut her up. Jenkins stated that she was able to escape from defendant while he put his pants back on, and that she saw defendant flee to the field behind the Valu-King. Defendant later pled guilty to the rape in juvenile court.

Mary Ann Brison testified that she was raped at knifepoint by defendant on the morning of February 8, 1984 while walking on a path leading from the Valu-King.

Stephen Melius testified that he was a cellmate of defendant in the Juvenile Justice Center during the winter of 1984. Melius stated that defendant put his hand on him and expressed a desire to perform anal intercourse and fellatio on him. Melius testified that he refused both the defendant's advances and the invitation to perform anal intercourse and fellatio with defendant.

Evid.R. 404(B) provides:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

R.C. 2945.59 states as follows:

"In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his

motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant."

In our view, the testimony of all three witnesses was properly admitted since such testimony tended to show the motive, plan and identity of defendant. See Benner, supra, 40 Ohio St.3d at 306, 533 N.E.2d at 708.

In State v. Flonnory (1972), 31 Ohio St.2d 124, 126, 60 O.O.2d 95, 96-97, 285 N.E.2d 726, 729, this court observed:

"Much confusion about R.C. 2945.59 might be avoided if it were observed that nowhere therein do the words 'like' or 'similar' appear. The statute permits the showing of 'other acts' when such other acts 'tend to show' certain things. If such other acts do in fact 'tend to show' any of those things they are admissible notwithstanding they may not be 'like' or 'similar' to the crime charged." (Emphasis added.)

Likewise, in State v. Jamison (1990), 49 Ohio St.3d 182, 552 N.E.2d 180, this court held in the syllabus:

"Other acts forming a unique, identifiable plan of criminal activity are admissible to establish identity under Evid R. 404(B). To be admissible these other acts must tend to show by substantial proof 'identity' or other enumerated purposes under Evid.R. 404(B). Although the standard for admissibility is strict, the other acts need not be the same as or similar to the crime charged. ***"

In light of these precedents, we believe that Jenkins's testimony tended to identify defendant as an assailant of Fife because similarly to the instant murder, defendant left his mark by biting Jenkins during the commission of the rape. Defendant's threat to Jenkins that he would stick the knife up her rectum is similar to what was perpetrated on Fife, except with a broken broom-like handle.

Brison's testimony tended to show defendant's plan to attack and rape in the same wooded field area behind the Valu-King where Fife was brutalized.

Melius's testimony tended to show defendant's motive to forcibly have sex with another male.

In any event, even if the admission of the testimony was improper, since the case was tried before a three-judge panel, it must affirmatively appear on the record that the panel relied on the alleged improper testimony. State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

Given that the trial panel stated in its opinion weighing the aggravating circumstances against the mitigating factors that "no prior crimes were considered by the Court in any way in reaching its verdict," we fail to see how defendant was prejudiced. Accordingly, we overrule defendant's eighth proposition of law.

In his ninth proposition of law, defendant submits that his rights to due process and a fair and impartial trial were violated when the trial court admitted evidence that was not relevant, or whose relevance was outweighed by its prejudicial effect.

The first example of error raised by defendant concerns

the testimony of Raleigh Hughes, an ambulance attendant who arrived at the murder scene, who commented on the condition of the victim's body.  In summarizing his impression of what he saw, Hughes stated that it was "one of the most gruesome things I've ever seen."

While Hughes's testimony in this respect should probably not have been admitted, there has been no showing of prejudice that overcomes the presumption that the three-judge panel considered only the relevant, nonprejudicial evidence submitted.  See Post, supra.

Defendant next challenges the admission of the broomstick into evidence by arguing that there was no probative value in its admission.  However, we believe that admission of the stick was properly justified for several reasons:  (1) Donald Allgood testified that he saw defendant "flick" a stick into the woods at the time and near the place where the homicide took place; (2) defendant stated on tape that Tim Combs stuck "[a] stick *** [l]ike a broom handle thing" in the victim's rectal opening; and (3) Dr. Adelman testified that the shape of the stick in comparison to the injury inflicted in the victim's rectum was "very similar to a key in a lock."  Given the foregoing testimony, we find that the stick was properly admitted into evidence during the trial.

Lastly, defendant alleges error in the testimony of Dr. Adelman that asphyxia by strangulation can cause a penile erection.  In our view, however, such testimony was relevant in supplementing the testimony of Dr. Mertz to explain the differences in the size of the marks made on the victim's penis and the bite impression taken of defendant.

Based on all the foregoing, we find defendant's ninth proposition of law to be not well taken.

Defendant, in his tenth proposition of law, contends he was denied a fair trial because the trial court admitted into evidence State's Exhibit 47, the broomstick.  Defendant argues under this proposition that the stick should not have been admitted because it caused the trial court to erroneously draw an inference from another inference.  In support, defendant relies on Sobolovitz v. Lubric Oil Co. (1923), 107 Ohio St. 204, 140 N.E. 634.

Upon a careful review of the record, we believe that the facts adduced during trial led the court to draw only one inference: that the stick was used on the victim and, thus, was properly admitted.  The admission by defendant that "a broom handle thing" was used, Allgood's testimony that he saw defendant "flick" a stick into the woods, Dr. Adelman's "key in a lock" testimony, and plant fibers found in the victim's rectum all supported the single inference that the stick was used on the victim.  Also, passing over the fact that the Sobolovitz holding was later limited, we find that it is readily distinguishable from the cause sub judice. Accordingly, we overrule defendant's tenth proposition of law.

In his eleventh proposition of law, defendant asserts that his right to confrontation of witnesses against him was violated when the prosecutor consulted a witness who was subject to recall and who was a surprise witness of which defense counsel had no prior knowledge.  In support of his argument, defendant relies on Davis v. Alaska (1975), 415 U.S.

308, 94 S.Ct. 1105, 39 L.Ed.2d 347, and State v. Prater (1983), 13 Ohio App.3d 98, 13 OBR 114, 468 N.E.2d 356.

We believe, however, that neither of these cases is on point or supports defendant's assertion. When the witness complained of, Stephen Melius, was recalled as a witness, he was questioned by defense counsel with respect to his contacts with the prosecution.3 A review of the testimony and other evidence reveals that the defendant's right to confrontation was not infringed, nor was his opportunity for cross-examination denied or restricted. Even if we were to assume that Melius was in fact a surprise witness, the defendant had a full and fair opportunity to cross-examine on Melius's limited testimony and, thus, any error was rendered harmless. Accordingly, we find defendant's eleventh proposition of law to be unmeritorious.

In his twelfth proposition of law, defendant argues that he was denied due process because the pool of propective jurors was drawn from only licensed drivers who were registered voters, and that such pool did not reflect a fair cross-section of the community.

Contrary to defendant's argument, the great weight of authority supports the validity of voter registration lists as the sole source of prospective jurors. See, e.g., State v. Johnson (1972), 31 Ohio St.2d 106, 60 O.O.2d 85, 285 N.E.2d 751, paragraph two of the syllabus. Accord State v. Spirko (1991), 59 Ohio St.3d 1, 35-36, 570 N.E.2d 229, 265.

In any event, defendant waived his right to a jury trial and opted for a trial before a three-judge panel. Under these circumstances, the denial of defendant's motion by the trial court to expand the pool of potential jurors did not prejudice him. Therefore, we summarily overrule defendant's twelfth proposition of law.

In his thirteenth proposition of law, defendant contends that the trial court failed to determine on the record whether his waiver of a jury trial was made knowingly, intelligently and voluntarily.

We have reviewed the record regarding defendant's waiver and believe his argument in this vein is totally devoid of merit. As this court pointed out in State v. Jells (1990), 53 Ohio St.3d 22, 26, 559 N.E.2d 464, 468: "The Criminal Rules and the Revised Code are satisfied by a written waiver, signed by the defendant, filed with the court, and made in open court, after arraignment and opportunity to consult with counsel."

Since the trial court amply fulfilled the requirements set forth in Jells, supra, we find defendant's thirteenth proposition of law to be not well taken.

In his fourteenth proposition of law, defendant asserts that the trial court committed reversible error in denying him the funds necessary to employ an expert for purposes of a motion for closure of a pretrial hearing that was necessary to preserve a fair and impartial jury.

We find this assertion to be without merit. Even assuming that the trial court erred in this vein, any prejudice to defendant was eliminated by his subsequent waiver of his right to a trial by jury. Accordingly, we summarily reject defendant's fourteenth proposition of law.

In his fifteenth proposition of law, defendant argues that

the trial panel abused its discretion in admitting a predeath photograph of the victim and permitting the victim's mother to testify about her family. Defendant submits that introduction of such sympathy testimony constitutes reversible error.

In our view, defendant's claim of error is without merit. Defendant tries to raise Miriam Fife's testimony to the level of an impermissible victim-impact statement proscribed by Booth v. Maryland (1987), 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed. 440, but a careful review of her testimony reveals nothing even remotely approaching impermissible "victim impact evidence." In any event, we note once again that the cause was tried before a three-judge panel and not a jury, and we find nothing which would indicate that the three-judge panel relied on such evidence in arriving at its sentence. Post, supra. Therefore, we overrule defendant's fifteenth proposition of law.

Defendant, in his sixteenth proposition of law, contends that his rights to a fair trial and to effective assistance of counsel were violated by the state's repeated failure to comply with the discovery requirements of Crim. R. 16. Specifically, defendant submits that the state failed to provide the following discoverable information: (1) Donald Allgood's identification of defendant from a photo array, (2) the photo array itself, (3) photos of defendant with officers at the crime scene and accompanying oral statements of defendant, (4) the testimony of Stephen Melius, and (5) photos utilized by defense witness Dr. Levine in his testimony regarding the bite marks on the victim's penis.

In State v. Wickline (1990), 50 Ohio St.3d 114, 117, 552 N.E.2d 913, this court reaffirmed the standard of "materiality" set forth in State v. Johnston (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, 917, paragraph five of the syllabus:

"In determining whether the prosecution improperly suppressed evidence favorable to an accused, such evidence shall be deemed material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome. This standard of materiality applies regardless of whether the evidence is specifically, generally or not at all requested by the defense. (United States v. Bagley *** [1985], 473 U.S. 667 [105 S.Ct. 3375, 87 L.Ed.2d 481], followed.)"

Upon reviewing the items enumerated by defendant, we find that his contentions in this respect are without merit. With regard to the pictures used by Dr. Levine, we point out that he was defendant's expert witness and it is undisputed the defense was aware, through discovery, that Dr. Levine concluded the bite marks could have been made by defendant. Even if defendant had had the photographs used by Dr. Levine, the outcome of the trial would not have been different.

We also discern no prejudice to defendant from the state's failure to supply the photo array used by Donald Allgood. The photo array was not introduced at trial and was not "material" under the Johnston test.

With respect to the photos of defendant with the officers at the crime scene, we note that the trial panel did, pursuant to Crim.R. 16(E)(3), offer defendant a continuance, but

defendant declined.  The statements made by defendant at the crime scene were never transcribed.  Once again, we find no prejudicial error in the state's failure to supply such photos pursuant to Crim.R. 16.

In regard to the testimony of Stephen Melius, we believe that such testimony although of some relevance, was not crucial and merely dealt with a collateral similar act.  In addition, the defense cross-examined Melius and recalled him as a witness the day after his initial testimony.  Defendant has not articulated how Melius's testimony was "material" or would have affected trial preparation, strategy or outcome.  In any event, the trial panel stated that it disregarded defendant's prior acts.

Since we believe that no prejudicial error has been shown, we overrule defendant's sixteenth proposition of law.

In his seventeenth proposition of law, defendant argues that the trial panel abused its discretion in admitting photographs of the victim that he characterizes as "highly prejudicial, gross and unnecessary" and lacking in probative value.

In State v. Maurer (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 792, this court stated that "[p]roperly authenticated photographs, even if gruesome, are admissible in a capital prosecution if relevant and of probative value in assisting the trier of fact to determine the issues or are illustrative of testimony and other evidence, as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number."  See, also, Benner, supra, and State v. Apanovitch (1987), 33 Ohio St.3d 19, 514 N.E.2d 394.

In our view, the probative value of the photographs complained of far outweighed any prejudicial effect.  Similar to our holding in Jells, supra, which was also tried before a three-judge panel, the outcome would not have been different here even if the gruesome photographs had not been introduced into evidence.  The photographs in issue were relevant, however, to support the testimony of the expert witnesses during trial.  In any event, since the introduction of such photographs did not constitute prejudicial error, we overrule defendant's seventeenth proposition of law.

In his eighteenth proposition of law, defendant asserts that he was denied a fair trial by prosecutorial misconduct during both the guilt and mitigation phase closing arguments. Specifically, defendants cites fourteen instances of what he alleges to be improper prosecutorial comments.4

In State v. Liberatore (1982), 69 Ohio St.2d 583, 589, 23 O.O.3d 489, 493, 433 N.E.2d 561, 566, this court observed that "the prosecution is entitled to a certain degree of latitude in summation."  Additionally, in State v. White (1968), 15 Ohio St.2d 146, 151, 44 O.O.2d 132, 136, 239 N.E.2d 65, 70, we noted that "[w]e indulge in the usual presumption that in a bench trial in a criminal case the court considered only the relevant, material, and competent evidence in arriving at its judgment unless it affirmatively appears to the contrary." See, also, Jells, supra, and Post, supra.

A review of the instances cited by defendant indicates

that no objections were raised when any of the complained-of comments were made, and therefore any error is deemed waived. State v. Lott (1990), 51 Ohio St.3d 160, 167, 555 N.E.2d 293,    .  In addition, we find that neither prejudicial error nor plain error as set forth in State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E. 2d 804, is present in the context in which the comments by the prosecution were made. Accordingly, we find defendant's eighteenth proposition of law to be not well taken.

Defendant, in his nineteenth proposition of law, cites seven instances in which he was denied a fair trial due to the ineffective assistance of counsel in that counsel failed:  (1) to request hearings on all the pretrial motions that were filed; (2) to attempt to seat a jury before waiving the right to a jury trial; (3) to fully advise the defendant of his legal rights concerning his waiver of a jury trial so that he could voluntarily, knowingly and intelligently decide whether to waive the right; (4) to enter a continuing objection to a police officer's testimony of his belief that defendant was lying; (5) to timely file a motion for a new trial with a hearing; (6) to object to the state's improper closing argument; and (7) to preserve the record or otherwise object on any issue that this court or any future court deems waived by such omission.

In Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693, the high court established a two-prong analysis for determining whether ineffective assistance of counsel merits a reversal of a criminal conviction:

"*** First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious tht counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. ***"

In applying the Strickland standard to the seven instances of ineffective assistance of counsel, and upon reviewing the instances both individually and collectively, we find no prejudice to defendant that compels a reversal of his conviction.  Therefore, we overrule defendant's nineteenth proposition of law.

In his twentieth proposition of law, defendant asserts that "the trial court erred in entering a judgment of conviction for kidnapping and the other felonies where convictions on both offenses are contrary to R.C. 2941.25. Secondly, where an underlying felony count which is also used as a specification for aggravated murder merges, then it cannot be considered as an additional specification for sentencing purposes."

In the cause sub judice, defendant was convicted of kidnapping, rape, aggravated arson, felonious sexual penetration and aggravated murder.

R.C. 2941.25 provides as follows:

"(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import,

the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

"(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them."

In State v. Blankenship (1988), 38 Ohio St.3d 116, 117, 526 N.E.2d 816, 817, this court summarized the many precedents involving R.C. 2941.25:

"This court has set forth a two-tiered test to determine whether two crimes with which a defendant is charged are allied offenses of similar import. In the first step, the elements of the two crimes are compared. If the elements of the offenses correspond to such a degree that the commission of one crime will result in the commission of the other, the crimes are allied offenses of similar import and the court must then proceed to the second step. In the second step the defendant's conduct is reviewed to determine whether the defendant can be convicted of both offenses. If the court finds either that the crimes were committed separately or that there was a separate animus for each crime, the defendant may be convicted of both offenses."

In State v. Logan (1979), 60 Ohio St.2d 126, 14 O.O.3d 373, 397 N.E.2d 1345, a case upon which defendant relies, this court found rape and kidnapping to be allied offenses of similar import. However, the Logan court also held that where murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense. Id. at 135, 14 O.O.3d at 379, 397 N.E.2d at 1352.

Similarly, in State v. Powell (1990), 49 Ohio St.3d 255, 262, 552 N.E.2d 191, 199, this court found kidnapping and attempted rape not to be allied offenses of similar import.

In the instant cause, the record reflects that the kidnapping commenced near the parking lot of Valu-King. Defendant, along with Tim Combs, forcibly removed Raymond Fife from the path near the parking lot to a wooded area where they could not be seen. There, the victim was purposely and repeatedly beaten on the head and body. This does not appear to have been done for the immediate motive of rape, felonious penetration or aggravated arson, but to terrorize and inflict serious physical harm. See R.C. 2905.01(A)(3) (kidnapping).

Anal intercourse was also performed forcibly on the victim, which constitutes rape. In addition, the bite marks on the victim's penis indicate that fellatio was performed by defendant. A piece of wood was stuck into the victim's anus (felonious sexual penetration). The evidence also shows that the victim was strangled by his own underwear and set on fire (aggravated arson).

The foregoing scenario demonstrates that not only was there a separate immediate motive or animus, but that the acts were committed separately with the kidnapping continuing after the rape.

Based on the facts and evidence set forth in the record, as well as Logan, supra, we hold that the crimes upon which defendant was convicted were not allied offenses of similar

import and the trial panel did not err in considering the specifications for sentencing purposes. Accordingly, we find defendant's twentieth proposition of law to be without merit.

In his twenty-first proposition of law, defendant argues that his constitutional rights were violated when the trial panel denied his motion for a new trial without a hearing.

Crim.R. 33 allows a trial court to entertain a motion for a new trial, and "[t]he allowance of a motion for a new trial on the grounds of newly discovered evidence is within the competence and discretion of the trial judge; and in the absence of a clear showing of abuse such decision will not be disturbed." State v. Williams (1975), 43 Ohio St.2d 88, 72 O.O.2d 49, 330 N.E.2d 891, paragraph two of the syllabus.

A review of the record reveals that the only newly discovered evidence proffered by defendant at the time of his motion was the affidavit of his brother, Raymond Vaughn, who recanted his sworn testimony that he had seen defendant washing blood out of pants. In our opinion, even with the recantation affidavit, the result of the defendant's trial would not have been different. See State v. Duling (1970), 21 Ohio St.2d 13, 50 O.O.2d 40, 254 N.E.2d 670.

Since we find no abuse of discretion by the trial court in this vein, we overrule defendant's twenty-first proposition of law.

In his twenty-second proposition of law, defendant essentially contends that Ohio's statutory framework for imposition of capital punishment creates a mandatory sentencing scheme in contravention to both the state and federal constitutions.

We find defendant's argument in this vein to be not well taken. As this court noted in State v. Jenkins (1984), 15 Ohio St.3d 164, 174, 15 OBR 311, 320, 473 N.E.2d 264, 279: "[t]he system currently in place in Ohio does require the sentencing authority to focus on the particular nature of the crime as well as allow the accused to present a broad range of specified and nonspecified factors in mitigation of the imposition of the death sentence."

In addition, this court upheld the statutory framework assailed by defendant in State v. Buell (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795. Accordingly, we reject defendant's twenty-second proposition of law.

In his twenty-third proposition of law, defendant argues that the trial panel failed to consider all of the evidence in support of mitigation during the penalty phase, and thus violated R.C. 2929.03(F) and the Eighth and Fourteenth Amendments to the United States Constitution.

Our careful review of the sentencing opinion, however, convinces us that the trial court did in fact consider all mitigating factors presented by defendant, and articulated the reason each was outweighed by the aggravating circumstances beyond a reasonable doubt. Thus, we hold that the trial court complied with the dictates of R.C. 2929.03(F). See State v. Steffen (1987), 31 Ohio St.3d 111, 118, 31 OBR 273, 279, 509 N.E.2d 383, 391. Therefore, we overrule defendant's twenty-third proposition of law.

In his twenty-fourth proposition of law, defendant contends that the death penalty scheme established in R.C.

2903.01 and 2929.02 et seq. violates the United States and Ohio Constitutions both facially and as applied to defendant.

The specific claims of unconstitutionality by defendant have been rejected by this court in numerous cases. See, e.g., Jenkins, Buell, and Lott, supra. Accordingly, we reaffirm the constitutionality of Ohio's death penalty scheme both facially and as applied to defendant, especially since defendant proffers no compelling reason as to why the death penalty scheme is unconstitutional as applied to him. Therefore, we overrule defendant's twenty-fourth proposition of law.

In his twenty-fifth and final proposition of law, defendant argues that this court cannot find him guilty of aggravated murder, or find that the death sentence is proportionate and appropriate, under the independent appellate review required by R.C. 2929.05(A).

As has been set forth in the factual recitation above, and as will be seen in this court's independent review of the defendant's guilt and death sentence, the conviction rendered by the trial panel was supported by sufficient evidence and the death sentence is both proportionate and appropriate. Thus, we reject defendant's final proposition of law.

Having reviewed the various propositions of law raised by defendant, and having found none of them to be meritorious, we next turn to our responsibility of independently weighing the aggravating circumstances against the mitigating factors of the case.

In so doing, we review the testimony in the record, and note first that defendant's mother, Vera Williams, testified that all of her children were "slow" and that defendant's father never lived with the family. In sum, defendant had a poor family environment.

Dr. Douglas Darnall, a psychologist, testified that defendant had an I.Q. of 55 and that his intelligence level according to testing fluctuates between mild retarded and borderline intellectual functioning, and that he is of limited intellectual ability. Dr. Darnall did state, however, that defendant was able to intellectually understand right from wrong.

Dr. Nancy Schmidtgoessling, a clinical psychologist, testified that defendant had a full scale I.Q. of 68, which is in the mild range of mental retardation, and that the defendant's mother was also mildly retarded. Dr. Schmidtgoessling also testified that defendant's moral development level was "primitive," a level at which "one do[es] things based on whether you think you'll get caught or whether it feels good. [T]hat's essentially whereabout [sic] a 2-year old is."

Dr. Douglas Crush, another psychologist, testified that defendant had a full-scale I.Q. of 64, and that his upper level cortical functioning indicated very poor efficiency.

Other mitigation testimony on behalf of defendant indicated that he was a follower and not a leader, who had to be placed in group homes during his youth.

Defendant also gave an unsworn statement to the trial court, in which he stated that he was sorry what happened, and that he didn't want to die. Defendant then started to cry.

With respect to the enumerated mitigating factors set

forth in R.C. 2929.04, we find that defendant's mental retardation is a possible mitigating factor. See Penry v. Lynaugh (1989), 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256. However, as the Penry court noted, there are various levels of mental retardation, and a person must be viewed individually as to the degree of retardation.

Upon a careful review of the expert testimony proffered with respect to defendant's mental retardation, we find a very tenuous relationship between the acts he committed and his level of mental retardation. As several of the experts pointed out, defendant did not suffer from any psychosis, and he knew right from wrong.

Defendant's relative youth, i.e., eighteen years old at the time of the murder, is entitled to some weight. However, we believe this mitigating factor is clearly outweighed by the aggravating circumstances of the case. In addition, defendant's poor family environment, even if considered in mitigation, in no way outweighs the aggravating circumstances.

When considering the manner in which the victim was kidnapped and killed; the rape, burning, strangulation and torture the victim endured; and the total brutalization that took place, we find that these aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

Finally, this court must decide whether the sentence of death imposed here is excessive or disproportionate to the sentences in similar cases. We hold that the death sentence here is neither excessive nor disproportionate to the sentences approved for kidnapping/rape/murder in State v. Durr (1991), 58 Ohio St.3d 86, 568 N.E.2d 674; Benner, Steffen, and Apanovitch, supra. Accordingly, the penalty imposed here is appropriate.

In conclusion, we first find that there is no merit to any of the specific propositions of law raised by defendant that would compel a reversal of his convictions of the crimes described. Second, we find that the aggravating circumstances outweigh the mitigating factors presented, beyond a reasonable doubt. Third, we find the evidence sufficient to support the conviction, and the sentence of death appropriate in this case, as it is neither excessive nor disproportionate to the penalty imposed in similar cases. Therefore, in accordance with R.C. 2929.05(A), we affirm the conviction and sentence of death in this cause.

Accordingly, the judgment of the court of appeals is hereby affirmed.

                                        Judgment affirmed.

Moyer, C.J., Holmes, Douglas, Wright, H. Brown and Resnick, JJ., concur.

FOOTNOTES:

1  Timothy Combs was also charged and convicted as a principal offender in the murder of Raymond Fife. See State v. Combs (Dec. 2, 1988), Portage App. No. 1725, unreported, 1988 WL 129449.

2  R.C. 2935.05 provides as follows:

"When a person named in section 2935.03 of the Revised Code has arrested a person without a warrant, he shall, without unnecessary delay, take the person arrested before a court or magistrate having jurisdiction of the offense, and shall file or cause to be filed an affidavit describing the offense for

which the person was arrested. Such affidavit shall be filed either with the court or magistrate, or with the prosecuting attorney or other attorney charged by law with the prosecution of crimes before such court or magistrate and if filed with such attorney he shall forthwith file with such court or magistrate a complaint, based on such affidavit."

3 Upon recall, the following exchange took place between defense counsel and Stephen Melius:

"Q. *** have you had an occasion to talk with any officers of the Warren Police Department prior to the time you arrived here today and were sitting in the hallway?

"A. Yes, sir.

"***

"Q. And who were those officers?

"A. This guy sitting right here (indicating).

"Q. This guy sitting right here (indicated)? Pete? Technically, he's an officer. Pete. And what'd Pete talk to you about?

"A. He just told me that you guys were going to subpoena me back into Court, and he told me some of the questions that you might ask me.

"Q. Oh, he did! Oh! Okay. That's interesting. What kind of questions did he tell [you] I was going to ask you?

"A. He said you might -- that you might ask me that I gave some of the wrong dates and stuff like tht.

"Q. Okay. Remember anything else?

"A. Um-hum. No.

"Q. Well, how'd you answer the questions? What did he ask you specifically?

"A. He asked me if -- that I was -- that I gave you the wrong dates about the times me and Danny Lee Hill were in JJC together.

"Q. He told you you gave the wrong dates?

"A. Yes.

"Q. I see. What else did he tell you?

"A. That's about it.

"Q. That's about it?

"A. Um-hum.

"Q. Okay. ***."

4 The instances of prosecutorial misconduct alleged by defendant are as follows:

1. "You know, back on September 10th, our community had a little boy, and we've had a lot of little boys in our community, but this 12-year old boy we have not talked about too much. We've dealt with him in an abstraction. He hasn't been here. And the Court is aware of the leaps and bounds and the rights of victims. I'm not trying to ignore the procedural rights of the defendants in cases, but sometimes we forget and don't pay attention when we talk about Constitutional Rights of the defendant, and we don't, in the balance -- how about Raymond Fife's right to live? How about his Constitutional Rights to be here today, to be in school, to celebrate his 13th birthday with his parents."

2. "The question that is to be determined by this Court is whether that man [indicating to the defendant] and his buddy, Timothy Combs, engaged in a criminal enterprise wherein he destroyed and devoured a little boy on the 10th day of

September of 1985.  \*\*\* I can't imagine in my 10 years as being prosecutor that this could happen."

3.  "Now, one witness that testified.  Candyce Jenkins \*\*\* describes the defendant as an 'animal.'  The other one hatred."

4.  "\*\*\* [B]ut he [the defendant] followed him [Timothy Combs] back to the scene of the crime to look for evidence to destroy so they could cover up their heinous, unbelieveable, animalistic behavior.  He would make the Marquis deSade proud!"

5.  "Now, we know on September 10th, 1985, the year of our Lord -- and I'm going to go through, as I view the evidence -- as Mr. Kontos and I see the facts to be and the truth to be."

6.  "Maybe Mr. Lewis will argue that Raymond wasn't on the bike.  It didn't have fingerprints.  Well, there's an explanation, you don't necessarily have fingerprints on everything.  And rain will affect fingerprints as it will affect blood."

7.  "Who does this Court feel is more qualified?  Mr. Dehus or Mr. Gelfius on the charcoal lighter as to paint thinner and hydrocarbons?  I thought that his testimony was much more credible.  I don't feel Mr. Dehus; it couldn't break down; very unlikely, and I don't think that's the case.  I think that the witness from the Arson Lab who deals strictly with arson is the most credible witness in this case, and that substantiates the State's case."

8.  "No one wants to testify against his brother, just like Morris Hill didn't want to testify against his nephew."

9.  "Finally, Your Honors, to get this poor, dumb boy who really wouldn't do anything, who tried to sexually attack Mr. Melius, tried to put his mouth in the boy's penis, grabbed his penis, we know he did violently rape Mary Ann Brison in the same wooded area.  Talked about how he talked hateful to her.  We know what he did to Candyce Jenkins; had anal sex, oral sex, vaginal sex, once again, anal sex, had a knife and threatened to cut her vagina out; bit her on the breast.  Seems to be his calling card; the bite.  And when she screamed and yelled that it hurt, he said, 'Good! I want it to hurt.'  And that's what this case is about.  This case isn't just about a killing. This case is about an individual who thrives and relishes on inflicting pain and torture to other human beings."

10.  "Raymond Fife was a 12-year-old boy; very active and vibrant, who was caught in the middle of a living hell caused by this defendant.  Raymond Fife had no justice while he was living, but he demands justice now even in his absence, and justice demands, Your Honors, that you return a verdict of guilty.  \*\*\*"

11.  "The reason that it is so clear is because the defense has not shown by or has not substantiated or brought about any mitigating factors in this case, and it's very clear, aggravating circumstances, especially three of them, will clearly outweigh the absence of any mitigation."

12.  "Well, I'd like to cite a few days that they weren't together:  February 8th, 1984, when this defendant raped Mary Ann Brison.  They weren't together March 3rd, 1984, when this defendant raped and brutalized Candyce Jenkins.  They weren't together April 1984 through April 1985 when this defendant was incarcerated."

13.  "In addition to that, he says he has difficulty with

his motor skills between the right hand and left hand and he's not very good at that. He didn't have any problem grabbing women that I told you about before. Grabbing them with his left hand and the knife in the right hand while he sexually assaulted them."

14. "Now, there was a witness that the State would have wanted to present in this case, but unfortunately we could not call him. Raymond Fife. He would have been able to testify as to what happened that particular day. He would have been able to tell all of us, including this defendant, how he felt when he was abducted and helpless and felt doomed because he had no opportunity to escape. He would have been able to tell us what it felt like to be punched and continually kicked; what it felt like to be strangled so severely that he'd be gasping for breath. He'd be able to describe the pain involved and sexual molestation. He'd also be able to tell you and tell all of us what it would feel like -- the indescribable pain when your flesh is burning and you're helpless to do anything about it. And finally, he'd be able to tell us what it would be like to have a stick rammed up your rectal cavity so deeply and so severely that it perforates through the rectum and goes into the urinary bladder. But he's not here to testify about that thanks to this defendant.

"There's some other things that Raymond Fife can't come here and testify about either. He can't testify about how he misses his family, about how he misses his friends in the Scout group, about how he'd like to be with his father in the backyard feeding the birds, how he'd like to be able to live and love and share his love with his family and friends, and he will never be able to do that because of this defendant; this manifestation of evil, this anomaly to mankind, this disgrace to mankind sitting at the end of that table took care of that! And the most commentary about the makeup of this defendant is the manner of the death of Raymond Fife."