DECISION.
A jury found appellant Kevin Rogers guilty of the murder of Anthony Isaacs in violation of R.C. 2903.02(A), the felonious assault of Glenn Brayton in violation of R.C. 2903.11(A)(1), and the aggravated robberies of Isaacs and Brayton in violation of R.C. 2911.01(A)(3). The trial court imposed a fifteen-year-to-life sentence on the murder count, an eight-year sentence on the felonious-assault count, and a ten-year sentence on each of the aggravated-robbery counts. It ordered the sentences to be served consecutively, for a total minimum sentence of forty-three years.
Rogers appeals his convictions, raising the following four assignments of error: (1) his convictions were against the manifest weight of the evidence; (2) the trial court erred by overruling his motion to suppress his statement; (3) the trial court erred by admitting photographs; and (4) his sentence violated his due process rights and constituted cruel and unusual punishment because it was excessive and disproportionate to the sentences imposed on his co-defendants.
During the early morning hours of August 28, 1999, Isaacs and Brayton were driven to the lower Mt. Auburn area of Cincinnati, Ohio, by an acquaintance. The driver parked the car in the vicinity of Lang Street and East Clifton Avenue and left, allegedly to purchase drugs. The car was unlocked and its windows were open. Isaacs and Brayton, who remained in the car, were very intoxicated. Brayton was sleeping in the front seat, and Isaacs was sprawled across the back seat.
According to the statement that Rogers gave the police, he and his girlfriend were walking on Lang Street when they were approached by Martez Dixon, Anthony Pugh, age fourteen, and a third unidentified male. Rogers asked Dixon and Pugh what two men in a nearby car wanted from him. Rogers, Pugh, Dixon, and the other male then made plans to rob Isaacs and Brayton. They walked to the car and, claiming to be police officers, removed Isaacs and Brayton, had them place their hands on the car, and frisked them. At that point, someone pulled up and told Isaacs and Brayton to leave before something happened. Isaacs started to walk away. Dixon hit Isaacs in the jaw and he went down. Rogers then punched Brayton across the chest, causing Brayton to stumble. Apparently, the unidentified assailant also beat Brayton. Rogers entered the car, using his shirt to open the door and to conceal his fingerprints, and removed ten dollars from the floorboard.
Rogers and his cohorts walked across the street, laughing at the men on the ground. When Brayton tried to get up, the assailants walked across the street, and Rogers once again hit Brayton, causing him to fall to the ground. At that point, Isaacs started to get up and wobbled to his feet. Brayton also rose and stumbled over to Isaacs. They grabbed each other and began to move toward the car. Dixon kicked Isaacs, knocking him down, and Rogers punched Brayton.
Rogers and his companions again crossed the street. But Dixon returned once more and began beating Isaacs while the others watched. Rogers punched Isaacs in the jaw when he tried to stand up, and Isaacs fell.
At some point, Dixon began stomping on Isaacs's head while his cohorts laughed. He then found a bottle and slammed it against Isaacs's head. Pugh began kicking Isaacs in the face with "hard soccer ball kicks." According to Rogers, Pugh's kicks were so forceful that had Pugh kicked Isaacs five more times, Isaacs's head would have been kicked off his body. Pugh removed Isaacs's wallet and ran down the street. When Pugh returned and said that Isaacs's wallet contained only twenty dollars, Rogers asked Pugh if he were going to share the money. The assailants left the scene, with Isaacs and Brayton lying helpless on the ground.
Rogers returned yet again to the scene and poured water on Isaacs, trying to revive him. He also offered Brayton a drink of water, which Brayton refused. Meanwhile, Rogers observed a policeman approach Brayton, ask questions, and point in Rogers's direction. Rogers saw Brayton shake his head. Rogers ran to a nearby apartment. He was arrested approximately a week later. Due to his condition, Brayton was able to identify only Dixon as one of the attackers.
In his first assignment, Rogers challenges the weight of the evidence supporting his convictions. His supporting argument, however, raises both sufficiency-of-the-evidence and weight-of-the-evidence issues. In evaluating a challenge to the weight of the evidence, this court must review the entire record, weigh the testimony and all reasonable inferences, consider the credibility of the witnesses and determine whether the jury clearly lost its way in resolving conflicts in the evidence and created a manifest miscarriage of justice, entitling the defendant to a new trial.[2] The jury is free to believe all, part, or none of a witness's testimony.[3] To reverse a conviction based on insufficient evidence, we must determine, after reviewing the evidence in the light most favorable to the state, that no "rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."[4]
Rogers argues that because there was no physical evidence linking him to the crimes, because Brayton did not identify him as an assailant, and because both he and his girlfriend testified that he was not involved in the murder of Isaacs, the assault on Brayton, or the robberies, he should not have been convicted. He also argues that he made an incriminating statement to the police because the officers said that they would let him go if he did so.
We have reviewed the record, and we conclude, based on the above standards, that there was evidence sufficient to sustain Rogers's convictions. Further, his convictions were not against the weight of the evidence. The jury had the discretion to determine the credibility of the witnesses and the weight to be given to evidence. Obviously, it determined that the trial testimony of Rogers and his girlfriend was less credible than the testimony of the other witnesses, both with respect to the attack on Brayton and Isaacs and with respect to the circumstances surrounding Rogers's statement. We overrule Rogers's first assignment.
In his second assignment, Rogers claims that the statement he gave Cincinnati Police Specialist David Feldhaus and Cincinnati Police Officer Robert Heinlein was involuntary. When Rogers moved to suppress the statement below, he argued that the statement was involuntary because he was under the influence of drugs and alcohol at the time, and because his IQ was 69.
The determination of whether a confession was made voluntarily must be based upon "the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement."[5] The review focuses on whether the confession was the product of a free and deliberate choice, and not the result of police coercion or overreaching.[6]
The suppression of a statement is "properly denied on the basis of its voluntariness, when the record discloses substantial evidence upon which the trial court, applying [the above criteria], might have concluded, by a preponderance of the evidence, that the statement was made voluntarily."[7]
The record demonstrates that the police officers who advised Rogers of his Miranda rights and the officers who taped his statement had no indication from his demeanor or actions that Rogers was then under the influence of drugs or alcohol. Further, Rogers never mentioned ingesting any drugs or alcohol. His taped statement showed that his responses were lucid, coherent and appropriate. There was, however, testimony from Rogers's cousin stating his belief that Rogers had ingested marijuana and crack cocaine on the night he was arrested.
Further, as to the issue of Rogers's IQ, the officers only knew that Rogers had said that he had completed the ninth grade, and that he could read and write. In their view, he answered all questions appropriately. Dr. Nancy Schmidtgossling testified that Rogers had an IQ of 69, which she described as making him "mildly borderline IQ." (Upon comparison of her answer to the question posed, Dr. Schmidtgossling probably meant that an IQ of 69 indicated that Rogers was mildly to mildly borderline mentally retarded.) She also testified, however, that she did not know whether a police officer would have recognized Rogers's mental deficiencies. She further stated that if a person with a low IQ was under the influence of drugs or alcohol, that person was more susceptible to trickery. But she also acknowledged that Rogers was "street smart."
Feldhaus said that Rogers was in an interview room for approximately three hours. During that time, he was offered a drink and food and was allowed to use the restroom if he needed to do so. There is also evidence of Rogers's familiarity with the legal system based on his juvenile record.
While there is conflicting evidence as to whether Rogers was under the influence of drugs or alcohol, the trial court apparently found the testimony of the police officers more credible and gave more weight to Rogers's taped statement, which it had the discretion to do.[8] Under the totality of the circumstances, we are not persuaded that Rogers's alleged mental state or his low intelligence alone, without evidence of police coercion or overreaching, made his statement involuntary.[9] We overrule Rogers's second assignment.
In his third assignment, Rogers argues that the photographs admitted at trial were prejudicial because they were gruesome and cumulative. The admission of photographs is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion.[10] A properly authenticated gruesome photograph is admissible at trial unless "because of its flammatory nature, [the photograph] creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence."[11]
Rogers objected to five photographs used by the coroner to explain injuries to Isaacs's brain. The coroner explained that the photographs were being used to help the jury understand the autopsy process. The first photograph demonstrated small hemorrhages to Isaacs's scalp. The second photograph showed a massive amount of hemorrhage and significant trauma to his scalp. The third photograph showed the part of Isaacs's scalp that was normal compared to the part that had been traumatized. The next photograph showed a skull fracture. The last photograph showed a subdural hematoma, the cause of Isaacs's death. The trial court did not abuse its discretion in admitting the photographs. We overrule Rogers's third assignment.
In his fourth assignment, Rogers claims that his sentence was disproportionate to those imposed on Pugh and Dixon. We first note that we are constrained from sustaining this assignment because, other than statements in the briefs, the record does not contain evidence of the sentences imposed on Pugh and Dixon. Rogers has attached to his appellate brief the judgment entries relating to Dixon's and Pugh's sentences. That indication of their sentences, however, cannot be considered by this court because it was not properly before the trial court at the time it imposed Rogers's sentence. "[A] reviewing court cannot add matter to the record before it, which was not part of the trial court's proceedings, and then decide the appeal on the basis of the new matter."[12]
(Because Rogers was the first of the participants to be sentenced, a direct appeal of this issue, which would require evidence outside the record, is not the proper proceeding in which to determine this issue.) The burden is on Rogers to demonstrate the assigned error. Because the record fails to reflect any error, we must overrule this assignment.
Accordingly, the judgment of the trial court is affirmed.
Gorman, P.J., and Winkler, J., concur.
[2] See State v. Martin (1983), 20 Ohio App.3d 172, 175, 485 N.E.2d 717,720.
[3] See State v. Antill (1964), 176 Ohio St. 61, 197 N.E.2d 548.
[4] See State v. Jenks (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus.
[5] See State v. Edwards (1976), 49 Ohio St.2d 31, 358 N.E.2d 1051, paragraph two of the syllabus, vacated in part on other grounds (1978),438 U.S. 911, 98 S.Ct. 3147.
[6] See Colorado v. Connelly (1986), 479 U.S. 157, 163, 107 S.Ct. 515,520.
[7] See State v. Moore (June 26, 1996), Hamilton App. No. C-348193, unreported.
[8] See State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972,982.
[9] See Colorado v. Connelly, supra; State v. Hill (1992),64 Ohio St.3d 313, 318, 595 N.E.2d 884, 890; State v. Sewell (Dec. 1, 1993), Hamilton App. No. C-930016, unreported.
[10] See State v. Morales (1987), 32 Ohio St.3d 252, 257, 513 N.E.2d 267,273.
[11] See id.
[12] See State v. Ishmail (1978), 54 Ohio St.2d 402, 377 N.E.2d 500, paragraph one of the syllabus.