RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 23a0196p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

IN RE: DANNY HILL,

　　　　　　　　　　　　　　*Movant.*　　　　　No. 20-3863

─────────────────

On Petition for Rehearing En Banc
United States District Court for the Northern District of Ohio at Youngstown.
No. 4:20-cv-01294—John R. Adams, District Judge.

Argued En Banc:  June 14, 2023

Decided and Filed:  August 25, 2023

Before:  SUTTON, Chief Judge; MOORE, CLAY, GIBBONS, GRIFFIN, KETHLEDGE,
STRANCH, THAPAR, BUSH, LARSEN, NALBANDIAN,
READLER, DAVIS and MATHIS, Circuit Judges.[*]

─────────────────

## COUNSEL

**ARGUED EN BANC:**  Sharon A. Hicks, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Cleveland, Ohio, for Movant.  Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY
GENERAL, Columbus, Ohio, for Respondent.  **ON SUPPLEMENTAL BRIEF:**  Sharon A.
Hicks, Matthew Gay, Calland M. Ferraro, OFFICE OF THE FEDERAL PUBLIC DEFENDER,
Cleveland, Ohio, for Movant.  Benjamin M. Flowers, Zachery P. Keller, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Respondent.  **ON AMICUS BRIEF:**
Matthew F. Kuhn, OFFICE OF THE KENTUCKY ATTORNEY GENERAL, Frankfort,
Kentucky, Tyler R. Green, Tiffany H. Bates, ANTONIN SCALIA LAW SCHOOL, Arlington,
Virginia, for Amici Curiae.

　　　　NALBANDIAN, J., delivered the opinion of the court in which SUTTON, C.J., and
GIBBONS, GRIFFIN, KETHLEDGE, THAPAR, BUSH, LARSEN, READLER, DAVIS and
MATHIS, JJ., joined.  THAPAR, J. (pp. 15–19), delivered a separate concurring opinion in
which SUTTON, C.J., and GRIFFIN, KETHLEDGE and READLER, JJ., joined.  CLAY, J. (pp.
20–31), delivered a separate dissenting opinion in which MOORE and STRANCH, JJ., joined.

─────────────────

[*]Hon. Eric E. Murphy recused himself from this case, and the Hon. Rachel S. Bloomekatz, who was
confirmed on July 18, 2023, did not participate.

———————————

**OPINION**

———————————

NALBANDIAN, J., Circuit Judge.   In 1986, Danny Hill was convicted of murder and sentenced to death in Ohio state court.  For 37 years, he's been challenging his conviction and sentence.  The Supreme Court vacated the decision of a panel of this Court to grant federal habeas relief.  After that, we again granted habeas relief based on different reasoning, and an en banc panel of this Court vacated that opinion and denied Hill's petition for relief.  With the first petition unsuccessful, Hill has filed a second habeas petition.  It's "second or successive."  So Hill must meet the gatekeeping provisions of 28 U.S.C. § 2244(b)(2).

**I.**

The brutal facts are familiar by now.   Danny Hill and Timothy Combs kidnapped 12-year-old Raymond Fife as he was riding a bike to a friend's house before a Boy Scout meeting.  *Shoop v. Hill*, 139 S. Ct. 504, 505 (2019) (per curiam); *State v. Hill*, Nos. 3720, 3745, 1989 WL 142761, at *1 (Ohio Ct. App. Nov. 27, 1989).  Hill and Combs beat Fife up.  *See State v. Hill*, 595 N.E.2d 884, 887–88, 902 (Ohio 1992).  They raped him in multiple ways.  *See id.* at 887.  They strangled him, bit his genitals, sodomized him, and burned him.  *See id.*  Then, Hill and Combs left Fife in a field to die.  *See id.*  Fife's father found him in that field—Fife died two days later.  *Id.* at 887–88.

Hill was indicted for kidnapping, rape, aggravated arson, felonious sexual penetration, and aggravated murder with specifications.  *Id.* at 888.  At trial, the government's case was substantial.  Several witnesses testified that Hill was around the crime scene on the day of Fife's death.  *Id.* at 889.  The state introduced Hill's confession to police that he had watched Combs beat up and rape Fife.  *Id.* at 888; *see also Hill*, 1989 WL 142761, at *2.  And it also introduced Hill's statement that he had been with the victim when Combs had gone to the Valu-King to get more materials to torture Fife.  *Hill*, 1989 WL 142761, at *3, *33; *Hill*, 595 N.E.2d at 888.  The state introduced a broomstick into evidence—the broomstick, found behind the Valu-King, that was used to commit felonious sexual penetration.  *Hill*, 595 N.E.2d at 887, 894, 899.  One of the

state's witnesses testified that Hill had raped her in the same wooded area where Fife was raped, and another testified that Hill had raped her multiple times after breaking into her home. *Id.* at 892. And other evidence for the rape showed that anal intercourse had been forcibly performed on Fife. *Id.* at 899.

Relevant here, the state's forensic odontologist testified at trial that in his "professional opinion, with reasonable degree of medical certainty, . . . Hill's teeth, as depicted by the models and the photographs that [he] had, made the bite on Fife's penis." *Id.* at 889. Hill called his own forensic odontologist, who said "that he could not conclude with a reasonable degree of certainty as to who made the bite marks on the victim's penis." *Id.* He followed up, however, with this: "What I'm saying is either Hill or Combs, or both, could have left some of the marks but the one mark that's consistent with the particular area most likely was left by Hill." *Id.*

In the end, a three-judge state-court panel convicted Hill of kidnapping, rape, aggravated arson, felonious sexual penetration, and aggravated murder with specifications. *Id.* at 899. The trial court then sentenced him to death. *Id.* at 902. Hill appealed to the Ohio Court of Appeals—challenging, among other things, the imposition of the death penalty based on an insufficiency of the evidence on the convictions and on the aggravators, which included rape. *See Hill*, 1989 WL 142761, at *3. The Ohio Court of Appeals explained that plentiful evidence, including Hill's confession that he had been with Combs at the time of Fife's rape and torture, supported the rape conviction: "The evidence of the rape included the biting of the penis, leaving teeth marks; the pulling of the genitalia, bruising the pelvic area; and the penetrating of the anus with the broom stick, perforating the rectum and rupturing the urinary bladder." *Id.* at *29. The Ohio Supreme Court agreed. *See Hill*, 595 N.E.2d at 902. And Hill's subsequent state habeas petition proved unavailing too. *See State v. Hill*, No. 94-T-5116, 1995 WL 418683, at *7 (Ohio Ct. App. June 16, 1995).

Hill filed his first federal habeas petition in 1996, challenging, among other things, the denial of expert assistance on the bitemark evidence in his state post-conviction petition under the Sixth, Eighth, and Fourteenth Amendments because "[t]he state of medical knowledge regarding bite marks was in flux at the time of the trial." (1996 Habeas Petition, p. 37.) *See Hill v. Anderson*, No. 4:96 CV 0795, 1999 U.S. Dist. LEXIS 23332, at *53, *61, *146 (N.D. Ohio

Sept. 29, 1999). The district court denied the petition, and Hill appealed. While the case was pending on appeal, the Supreme Court decided *Atkins v. Virginia*. *See* 536 U.S. 304, 321 (2002) (holding that it violates the Eighth Amendment to execute intellectually disabled defendants). Then, we remanded the case so that Hill could exhaust his state remedies on that claim. *See Hill v. Anderson*, 300 F.3d 679, 683 (6th Cir. 2002).

The state court determined that Hill was not intellectually disabled, so his death sentence stood. *See State v. Hill*, 912 N.E.2d 107 (Ohio 2009) (unpublished table decision); *State v. Hill*, 894 N.E.2d 108, 195 (Ohio Ct. App. 2008). With that, Hill moved to reopen his habeas petition in federal district court and amended his claims. The district court rejected this petition too. *See Hill v. Anderson*, No. 4:96 CV 00795, 2014 WL 2890416, at \*59 (N.D. Ohio June 25, 2014).

A panel of this Court then reversed the district court's denial of Hill's *Atkins* claim and granted habeas relief. *See Hill v. Anderson*, 881 F.3d 483, 513 (6th Cir. 2018). Next, the Supreme Court vacated that decision and remanded for the panel to reevaluate its reasoning. *Hill*, 139 S. Ct. at 509. The panel again granted habeas relief on the *Atkins* claim and granted the writ of habeas corpus as to Hill's death sentence. *See Hill v. Anderson*, 960 F.3d 260, 295 (6th Cir. 2020) (per curiam). Our Court, sitting en banc, vacated the panel's opinion and denied federal habeas relief. *See Hill v. Shoop*, 11 F.4th 373, 399 (6th Cir. 2021) (en banc), *cert. denied*, 142 S. Ct. 2579 (2022) (Mem.).

In the middle of all this habeas action, Hill moved in state court for leave to file a motion for new trial under Ohio Rule of Criminal Procedure 33(B)—a mechanism for allowing defendants to move for a new trial based on "newly discovered evidence" that the defendant "could not with reasonable diligence have discovered and produced at the trial."[1] This newly discovered evidence—Hill said—was a 2013 report from the American Board of Forensic

---

[1]The language of this Rule is similar to the evidentiary gatekeeping provision for second-or-successive habeas petitions under 28 U.S.C. § 2244(b)(2). *See* 28 U.S.C. § 2244(b)(2)(B) (requiring a petitioner to show that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" to hurdle the second-or-successive bar).

Odontology ("ABFO") that suggested using bitemarks to identify a specific individual as the biter might not be reliable. Hill later added a 2016 report backing up the 2013 report.[2]

The state trial court allowed Hill to move for a new trial and conducted an evidentiary hearing. But that court noted that "[i]t is settled practice" that "newly discovered" evidence only "refers to evidence that existed at the time of trial but of which the moving party was ignorant." (R. 1-1, Motion for New Trial Decision, PageID 322.) And the court held that there was "no probability" that a new trial would lead to a "different outcome" without the bitemark evidence because the state had proffered so much other evidence of guilt.[3] (*Id.* at PageID 334.) The state appellate court agreed, *State v. Hill*, 125 N.E.3d 158, 176 (Ohio Ct. App. 2018), and the Ohio Supreme Court denied review, *State v. Hill*, 123 N.E.3d 1040 (Ohio 2019) (unpublished table decision).

That brings us to Hill's second federal habeas petition. In this June 2020 petition, Hill made two separate but related points: (1) his "conviction and sentence [we]re predicated on fabricated scientific evidence, violating his due process rights" (R. 1, Habeas Petition, PageID 295.); and (2) the state trial court violated his due process rights by not properly conducting a materiality review of the bitemark evidence under Ohio Rule of Criminal Procedure 33(B). Because Hill believed that his petition was second in time but not "second or successive" under 28 U.S.C. § 2244(b), he did not ask for leave to file a "second or successive" petition.

---

[2]"The 2016 ABFO guidelines recognize that even where a patterned injury is determined to be 'human,' only the following terms should be used as they relate to [the] questioned dentition [of] a bite mark: A) Excluded as Having Made the Bitemark, B) Not Excluded as Having Made the Bitemark, C) Inconclusive." (R. 1-1, Exhibit 1, PageID 324.)

[3]In a response to a different argument Hill made about the voluntariness of his statements to the police, the trial court noted some of the most striking evidence: In his videotaped interview with the police after Fife was murdered, Hill "volunteered details about the murder and protracted torture of Raymond Fife," and "even demonstrated the location of the parties during the attack on a chalkboard . . . . Hill, without any emotion in his voice, described the boy's struggle to run[.]" (R. 1-1, Motion for New Trial Decision, PageID 317.) The trial court further noted that Hill was found guilty of three specifications for aggravated murder: kidnapping, rape, and aggravated arson. "A conviction [on] any one of the specifications made Hill eligible to receive a death sentence." (*Id.* at PageID 330.) And even setting aside the other specifications, under Ohio law, "there can be more than one principal offender in the commission of a crime." (*Id.*) Here the trial court quoted the Ohio Supreme Court's earlier decision, which held that even absent the bite marks, the other "various sexual acts" performed while Fife "was rendered unconscious" served as other evidence to meet the rape specification. (*Id.* at PageID 331.)

Despite Hill's characterization of the petition as only second in time, the district court concluded that Hill's petition was "second or successive" and thus required our authorization. So it transferred the petition to a panel of this Court to determine whether Hill's petition met the gatekeeping provisions of § 2244(b)(2). *See* 28 U.S.C. § 2244(b)(3)(A) (giving the federal courts of appeals exclusive jurisdiction to determine whether a "second or successive" petition passes the gatekeeping provisions of § 2244(b)(2)). Hill then filed his habeas petition on appeal. The case manager informed Hill that he needed to file a corrected petition on the second-or-successive form. And he did. (*See* Appellate R. 5, Corrected Petition, p. 1 ("Motion Under 28 U.S.C. § 2244 For Leave to File A Second or Successive Habeas Corpus Petition" (case altered)).) He maintained that his petition was not "second or successive." Yet he said that his claim relied on "newly discovered evidence," which is a prerequisite to meeting the gatekeeping provisions of § 2244(b)(2). (*See id.* at 6.)

The panel determined that Hill didn't need to meet the gatekeeping provisions, nor did he require our authorization to file, because his petition was second in time but not successive. The panel transferred the petition back to the district court for a merits determination. Next, the state moved for rehearing on whether Hill's petition is "second or successive." With that, we voted to rehear this case en banc.[4] And we review de novo whether Hill's petition is "second or successive." *See Lang v. United States*, 474 F.3d 348, 351 (6th Cir. 2007).

## II.

The Supreme Court has distinguished two separate questions in these cases. The threshold question is whether an application is "second or successive" under § 2244(b). If the answer is yes, then the second question is whether to dismiss the successive application. *See Magwood v. Patterson*, 561 U.S. 320, 336–37 (2010).[5] So determining whether a

---

[4]The decision that a petition is *not* "second or successive" is reviewable. *See Magwood v. Patterson*, 561 U.S. 320, 330–31 (2010).

[5]To be more specific, if we determine that a petition is "second or successive," then a panel of this Court must determine whether to authorize the filing of the petition. In doing so, the panel must consider whether the petitioner has made a "prima facie showing that the application satisfies" the § 2244(b)(2) requirements. 28 U.S.C. § 2244(b)(3)(C); *In re McDonald*, 514 F.3d 539, 546–47 (6th Cir. 2008). In this context, "prima facie" means "simply sufficient allegations of fact together with some documentation that would 'warrant a fuller exploration in the district court.'" *In re McDonald*, 514 F.3d at 546 (citation omitted). If we determine that the prima facie

numerically second petition is "second or successive" is the threshold determination for our review. Start with the framework. Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), "a state prisoner always gets one chance to bring a federal habeas challenge to his conviction." *Banister v. Davis*, 140 S. Ct. 1698, 1704 (2020). "But after that, the road gets rockier." *Id.*

After a petitioner has filed his first petition, any future petition is governed by § 2244(b). As we must, we start with the text of that provision. A petitioner can't bring the same claim in a second petition that was "presented in a prior application." 28 U.S.C. § 2244(b)(1). And when a "claim presented in a second or successive habeas" petition "was not presented in a prior [petition]," we must dismiss that claim unless one of two circumstances applies: (A) The petitioner "relies on a new [retroactively applied] rule of constitutional law"; or (B) "[T]he factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim . . . would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." *Id.* In short, it's much harder to file an authorized "second or successive" petition than it is for the petitioner to file his first habeas petition.

Importantly, though, the Supreme Court has said that not all petitions filed second in time are "second or successive." And when a "numerically second petition" is not "second or successive," it isn't "subject to the restrictions of 28 U.S.C. § 2244(b)." *In re Bowen*, 436 F.3d 699, 705–06 (6th Cir. 2006); *In re Hanna*, 987 F.3d 605, 608 (6th Cir.), *cert. denied sub nom. Hanna v. Shoop*, 142 S. Ct. 246 (2021). So there are two kinds of second-filed petitions: numerically second petitions that are not "second or successive" and numerically second petitions that are "second or successive." And the caselaw tells us how to distinguish them.

---

showing has been made, the "second or successive" application is transferred back to the district court. The district court then determines whether the § 2244(b)(2) requirements have actually been satisfied before possibly turning to the merits. 28 U.S.C. § 2244(b)(4); *see In re McDonald*, 514 F.3d at 547 (explaining that the district court must then "engage in additional analysis in order to ascertain whether but for the constitutional error, no reasonable factfinder would have found [the petitioner] guilty of the underlying offense").

The Court has noted that "second or successive" is a "term of art" that is "not self-defining." *Banister*, 140 S. Ct. at 1705 (quoting *Slack v. McDaniel*, 529 U.S. 473, 486 (2000); *Panetti v. Quarterman*, 551 U.S. 930, 943 (2007)). And in examining what qualifies as "second or successive," the Court has looked for general guidance in two places. First, the Court has "explored historical habeas doctrine and practice." *Id.* at 1705–06 (explaining that "[i]n particular" the Court has considered whether a "later-in-time filing would have constituted an abuse of the writ" as explained in "pre-AEDPA cases" (cleaned up)). And second, the Court has "considered AEDPA's own purposes." *Id.* at 1706. Those purposes include "to 'conserve judicial resources, reduc[e] piecemeal litigation,' and 'lend[] finality to state court judgments within a reasonable time.'" *Id.* (quoting *Panetti*, 551 U.S. at 945–46). "[T]he phrase 'second or successive' must be interpreted with respect to the *judgment* challenged." *Magwood*, 561 U.S. at 333 (emphasis added).

More specifically, the Supreme Court has carved out three circumstances when a petition is second in time but isn't "second or successive." First, when a second petition raises a claim that challenges a new state-court judgment—that is, not the one challenged in the first petition—the petition is not "second or successive." *See id.* at 339. Second, a second petition containing a claim—whether presented or not in the first petition—that would have been unripe at the time of the filing of the first petition is not "second or successive." *Panetti*, 551 U.S. at 943–45 (claim presented only in second petition but would have been unripe in the first petition); *Stewart v. Martinez–Villareal*, 523 U.S. 637, 643 (1998) (pre-AEDPA case where the claim was presented in both petitions but only became ripe in the second petition).[6] Third, when a second petition contains a claim that, though raised in the first petition, was unexhausted at that time and not

---

[6]It's worth noting that both *Panetti* and *Martinez-Villareal* involved claims under *Ford v. Wainwright*, 477 U.S. 399 (1986). In *Ford* cases, a competency-to-be-executed claim only ripens once the date for execution is set. *See Panetti*, 551 U.S. at 934–35 ("Under *Ford*, once a prisoner makes the requisite preliminary showing that his current mental state would bar his execution, the Eighth Amendment, applicable to the States under the Due Process Clause of the Fourteenth Amendment, entitles him to an adjudication to determine his condition."). In *Panetti*, the Court seemed to cabin the ripeness argument to the "unusual posture" of *Ford* claims. *Id.* at 945. Nevertheless, we have extended it to other ripeness claims. *See, e.g.*, *In re Salem*, 631 F.3d 809, 812–13 (6th Cir. 2011) (holding that because an entrapment claim was unripe in the first petition, the second petition was not "second or successive"). Those cases aren't at issue today.

decided on the merits, the petition is not "second or successive."[7]  *See Slack*, 529 U.S. at 486–87, 489.[8]

With all this in mind, in making the threshold determination for a second-in-time petition—that is, in determining whether the petition is "second or successive"—we need to define "claim" and "judgment."  That's because the Supreme Court and AEDPA have differentiated between claims and judgments for purposes of "second or successive" petitions.  A judgment is the legal mechanism "authorizing the prisoner's confinement," i.e., typically conviction or sentencing. *Magwood*, 561 U.S. at 332 (citation omitted); *see* 28 U.S.C. § 2254 (explaining that "a district court shall entertain an application for a writ of habeas corpus [o]n behalf of a person in custody pursuant to the *judgment* of a State court" (emphasis added)).  A claim is a legal challenge to that judgment.  *Gonzalez v. Crosby*, 545 U.S. 524, 530 (2005) (explaining that "a 'claim' as used in § 2244(b) is an asserted federal basis for relief from a state court's judgment of conviction").

So first, we ask, is the second petition challenging a new judgment or an old judgment? *See Magwood*, 561 U.S. at 330–33; *In re Caldwell*, 917 F.3d 891, 893 (6th Cir. 2019); *In re Stansell*, 828 F.3d 412, 415 (6th Cir. 2016); *King v. Morgan*, 807 F.3d 154, 157 (6th Cir. 2015). If it's a new judgment, then the petition is not "second or successive," and we turn to the merits of the petition. *See King*, 807 F.3d at 157.  If it's the old judgment that the petitioner challenged in his first petition, we next ask, is the claim presented an old claim or a new claim?  *See In re Wogenstahl*, 902 F.3d 621, 627 (6th Cir. 2018).  If it's an old claim—that is, one that was presented in the first petition—then it's a "second or successive" petition that must be dismissed under § 2244(b)(1).  If it's a new claim, we ask whether it was either unripe or ruled unexhausted at the time of the first habeas filing.  If so, then the petition isn't "second or successive." *See id.*

---

[7]The ripeness and exhaustion exceptions aren't tied to the text of § 2244.  Instead, as we noted above, the Supreme Court has looked to the purposes of AEDPA and congressional intent to determine that, although not plain on the face of the literal text of § 2244, not every numerically second petition is "second or successive."  *See Panetti*, 551 U.S. at 945 ("Our conclusion is confirmed when we consider AEDPA's purposes."); *id.* ("We conclude, in accord with this precedent, that Congress did not intend the provisions of AEDPA addressing 'second or successive' petitions to govern a filing in the unusual posture presented here[.]"); *Banister*, 140 S. Ct. at 1706 ("Here, both historical precedents and statutory aims point in the same direction[.]").

[8]Hill only challenges the second circumstance—whether the claim was previously ripe. *See infra* Part III.

at 627. If not, under the guidance we have from the Supreme Court, the petition is "second or successive," and the claim must meet the gatekeeping provisions under § 2244(b)(2)(B) to survive.

Although a mouthful, we can sum it up this way: When a second-in-time petition raises a new claim purporting to question the previously challenged judgment, the new claim was neither unripe nor unexhausted the first go-around, and the petitioner nevertheless failed to raise the claim, it is "second or successive." *See In re Coley*, 871 F.3d 455, 457–58 (6th Cir. 2017).

## III.

Now to Hill's second petition. He raises two claims: (1) he challenges his conviction under the Due Process Clause because professional standards surrounding bitemark evidence have changed; and (2) he says that the state trial court violated his rights under the Due Process Clause in denying his motion for new trial by failing to sufficiently evaluate the materiality of the bitemark evidence to the state's case. We must determine whether Hill's petition is "second or successive" based on these claims.

Under our roadmap, we start with whether Hill is challenging the same judgment he challenged in his first petition or a different judgment. Hill's first ground for habeas relief challenges the judgment of conviction, so he is challenging the same judgment. Hill's asserted second basis for habeas relief doesn't get him anywhere because it's attacking a motion-for-new-trial ruling. By definition, a motion for new trial attacks the original judgment. And a ruling on that motion doesn't create a new judgment—it's just another order. So the motion-for-new-trial ruling is not a judgment for purposes of § 2244(b). *See In re Stansell*, 828 F.3d at 417 (explaining that "new judgments" means "new sentences" or "new convictions"). So we'll focus on the first ground—which serves as another challenge to the same judgment he attacked in his first petition. Next, we ask whether Hill is raising an old claim or a new claim.

To evaluate Hill's argument, we have to define the claim at issue. Hill's claim is that he was denied his right to due process because the bitemark evidence at trial was unreliable based on new ABFO reports. As the Warden concedes, Hill didn't raise this claim in his first petition.[9]

Next, we ask whether that claim was unripe or unexhausted at the time he filed his first habeas petition. He only argues that his claim was unripe. But as Hill's 1996 habeas petition makes clear, a challenge to the bitemark evidence has always been available to Hill. So any claim as to the bitemark evidence's unreliability was ripe at the time of his first habeas petition. In other words, "the events giving rise" to Hill's claim—the introduction of bitemark testimony at trial—had already occurred when Hill filed his first petition. *In re Tibbetts*, 869 F.3d 403, 406 (6th Cir. 2017) (quoting *In re Jones*, 652 F.3d 603, 605 (2007)).

Hill says that his petition was unripe because the first ABFO report he relies on only came about in 2013. He points to *In re Jones* to show why. 652 F.3d at 605. In that case, Michigan significantly changed its parole system after Jones was convicted and sentenced, with the final changes occurring after Jones had filed his first habeas petition. *Id.* So, when Jones filed another habeas petition challenging the new parole conditions on ex post facto grounds, we said that he could not have brought the challenge in his first petition because "the events giving rise to the claim," i.e., the changes to parole conditions that "produced a sufficient risk of increasing the measure of punishment attached to his conviction," had "not yet occurred." *Id.* at 604–05 (cleaned up); *see id.* at 605 (explaining that Jones was "challeng[ing] the cumulative effect of amendments to Michigan's parole system, the last of which took effect . . . two years after Jones's initial habeas petition was filed"). As a result, the petition challenging "a parole

---

[9]In his first habeas petition, Hill did raise a claim tangential to his new due-process claim saying, "Petitioner was denied his rights as guaranteed by the Sixth, Eighth and Fourteenth Amendments to the United States Constitution when his request for expert assistance in his post conviction petition to reexamine the dental evidence was denied." (1996 Habeas Petition, p. 37.) He explained that "[b]etween . . . trial . . . and the time of his post-conviction much was learned about bite mark analysis [and] . . . [t]he state of medical knowledge regarding bite marks was in flux at the time of the trial." (*Id.*) And he said that while his "counsel on post-conviction requested expert assistance to reexamine the dental evidence presented at trial," the "trial court denied said motion without a hearing." (*Id.*)

This challenge to a denial of post-conviction expert assistance is not the same as his new due-process claim. And it's that fact—not just the fact that Hill is putting forth new evidence—that makes his due-process claim a new claim. *See Franklin v. Jenkins*, 839 F.3d 465, 474 (6th Cir. 2016) (explaining that the new evidence in that case didn't give rise to a new claim because that evidence didn't transform the "gravamen of [the petitioner's] argument" (citation omitted)).

determination . . . that occurred after the prisoner's initial petition was filed" was not "second or successive." *Id.* at 605–06.

But Jones brought another claim too—one that resembles Hill's claim in this case and one that Hill doesn't mention in his briefing. Jones's second claim was based on jury selection, and that made our job "more straightforward." *Id.* at 606. That's because, unlike his ex post facto claim, the jury-selection claim "challenge[d] events that occurred at his trial." *Id.* And that meant the claim had to meet the gatekeeping provisions of § 2244(b)(2) as a "second or successive" petition. *Id.*

Hill's bitemark-evidence claim is like Jones's jury-selection claim, not like Jones's ex post facto claim. Hill could have made his due-process bitemark challenge in his first petition because the events giving rise to the claim—the introduction of bitemark testimony at trial—had occurred at the time of the first petition. In other words, just like Jones's jury-selection claim, Hill's bitemark claim is based on "events that occurred at his trial." *Id.* Just as Jones's jury-selection claim had to pass the gatekeeping provisions of § 2244(b)(2), so does Hill's bitemark claim.

In a nearly identical case to Hill's, *In re Wogenstahl*, we recognized that a petitioner couldn't bypass the gatekeeping provisions of § 2244(b)(2) simply by presenting new evidence for a new *Brady* claim. *In re Wogenstahl*, 902 F.3d at 625–28. We said Wogenstahl's petition was "second or successive." *Id.* at 627–28. In that case, the new evidence Wogenstahl proffered undermined the testimony the government put on at trial. *See id.* at 625–26. Still, the petition was "second or successive" because "the predicates underlying Wogenstahl's current claims"— the government introducing testimony at trial—"had already occurred when he filed his petition." *Id.* at 627. Any new evidence undermining the government's trial testimony could go toward meeting the gatekeeping provisions under § 2244(b)(2)(B), we said, but couldn't go toward showing that the claim wasn't "second or successive." *Id.* at 628.

Under § 2244(b)(2)(B), when "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and that factual predicate "would be sufficient to establish by clear and convincing evidence" that "no reasonable factfinder would

have found the applicant guilty of the underlying offense," a petitioner can avoid dismissal of his "second or successive" habeas petition. 28 U.S.C. § 2244(b)(2)(B). It was Wogenstahl's burden to meet that standard, given that his petition was "second or successive."

And it's Hill's burden too.[10] Hill presents new evidence—evidence that wasn't available to him at the time of trial. And on the new evidence, he raises a new claim—that he was denied due process because his conviction is based on now-discredited evidence. But that claim has always been ripe because the factual predicates for the claim occurred at trial. That is, the bitemark testimony he now challenges occurred at trial, just like the testimony in Wogenstahl's case. So Hill must meet the gatekeeping provisions of § 2244(b)(2).

It's worth noting that we're not alone in treating a claim based on newly existing evidence the same way we treat *Brady* and *Giglio* claims in second-in-time petitions. Other circuits have assumed that claims based on newly existing evidence are "second or successive," and they have evaluated whether such claims meet the gatekeeping provisions of § 2244(b)(2)(B). *See Rhodes v. Smith*, 950 F.3d 1032, 1036 (8th Cir. 2020) (holding that "two peer-reviewed articles published" years after trial did not meet the gatekeeping provisions of § 2244(b)(2)); *Feather v. United States*, 18 F.4th 982, 985 (8th Cir. 2021) (rejecting a successive petition where the petitioner argued that "changes in forensic medical science" meant that "the government relied on 'fundamentally defective' evidence that was 'inconsistent with sound scientific methods'"); *see also Case v. Hatch*, 731 F.3d 1015, 1038 (10th Cir. 2013) (categorically not allowing newly existing evidence to meet the gatekeeping provisions).

The question of whether new evidence that was unavailable at trial can meet the gatekeeping provision of § 2244(b)(2)(B) is not before us, so we leave it to the panel to decide that question in the first instance and then perhaps the district court. In doing so, we are mindful

---

[10]Hill tries to distinguish his case from *In re Wogenstahl*. He points out that the ABFO reports—the new evidence in this case—were only published *after* trial. He says that his new evidence is "newly *existing* information," rather than newly *discovered* evidence, like in *In re Wogenstahl*. (Hill's Supplemental Briefing, p. 21.) That difference, he says, bolsters his argument that his due-process claim was unripe when he filed his first petition, in contrast to *Brady* and *Giglio* claims, which he concedes would be ripe in a first habeas petition under *In re Wogenstahl*. But Hill's distinction is without a difference. The factual predicates in his case—the introduction of bitemark evidence—occurred at trial. And that's just like the testimony in *In re Wogenstahl*. So the claim was ripe at the time Hill filed his first habeas petition.

of the fact that, even if Hill could use that kind of evidence to meet the gatekeeping provision of § 2244(b)(2)(B), to prevail on the merits, he must show that the state court's adjudication "resulted in a decision that was based on an unreasonable determination of the facts *in light of the evidence presented* in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added). And, as mentioned above, plentiful evidence of the other forms of rape Fife endured—evidence that was presented at trial—supported the rape conviction.

We note that if we came out Hill's way, most convictions involving forensic evidence would never be final. The end of Hill's logic is that a petitioner could raise a new due-process claim, unmoored from the gatekeeping provisions, anytime a relevant scientific standard changed. If that were the case, we'd be undermining § 2244(b)(2) and AEDPA generally—that is, we'd be undermining the finality of convictions. *See Banister*, 140 S. Ct. at 1707 ("AEDPA aim[s] to prevent serial challenges to a judgment of conviction, in the interest of reducing delay, conserving judicial resources, and promoting finality.").

**IV.**

For these reasons, we hold that the petition is "second or successive" and must meet the gatekeeping provisions of § 2244(b)(2). We return the case to the panel for further consideration.

---

**CONCURRENCE**

---

THAPAR, Circuit Judge, concurring.  I concur in the majority's thoughtful opinion.  I write separately because the time has come for our court to honor the law's deadlines.

In habeas, finality matters.  It matters for the victims.  It matters for the state.  And it matters for the criminal defendants.  Recognizing this, Congress passed the Antiterrorism and Effective Death Penalty Act with specific time limits.  We aren't free to ignore those limits.  Yet we have—and we should stop doing so.

I.

After torturing, raping, and killing a twelve-year-old boy, Danny Hill was convicted in 1986.  In the last thirty-seven years, Hill has sought review in the United States Supreme Court three times, Hill's case has come before a panel of this court four times, and the en banc court has now heard his case twice.  At almost every turn, courts have ruled against him.  Hill's case will now return to a panel—for the fifth time—to decide whether to let Hill file his second or successive petition.  *See* 28 U.S.C. § 2244(b)(3)(B).

According to AEDPA's text, the panel must act within "30 days."  *Id.* § 2244(b)(3)(D).  That law says that "courts of appeals *shall* grant or deny the authorization . . . not later than 30 days after the filing of the motion."  *Id.* (emphasis added).  It's hard to imagine a clearer command.

Unfortunately, we've flouted this command in the past, interpreting the thirty-day deadline as "advisory or hortatory rather than mandatory."  *In re Siggers*, 132 F.3d 333, 336 (6th Cir. 1997).  Our reasoning?  We cited a substantive canon that says Congress's commands are mandatory only if they include a penalty for noncompliance.  *Id.* (quoting *McCarthney v. Busey*, 954 F.2d 1147, 1152 (6th Cir. 1992)).  Because Congress "failed to specify a consequence for noncompliance with the thirty-day limit," we reasoned, "shall" doesn't mean "shall."  *Id.*

This reasoning falls short. For one, we forgot that parties can seek mandamus from the Supreme Court to enforce the thirty-day rule. *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380–81 (2004). For another, the canon isn't sound. The First Amendment, for example, also fails to specify a consequence for noncompliance, but that doesn't mean Congress can treat it as advisory or hortatory. *Gray-Bey v. United States*, 201 F.3d 866, 872 (7th Cir. 2000) (Easterbrook, J., dissenting). Finally, applying a substantive canon here fudges our limited role in interpreting law. Our role is to enforce the linguistic import of enacted text. *See Wilson v. Safelite Grp., Inc.*, 930 F.3d 429, 439 (6th Cir. 2019) (Thapar, J., concurring in part and in judgment); *Hale v. Johnson*, 845 F.3d 224, 227 (6th Cir. 2016). But substantive canons don't illuminate linguistic meaning. They favor specific policy outcomes. Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B.U. L. Rev. 109, 159–67 (2010). For that reason, we don't use substantive canons when the text is otherwise clear. *See Miller v. French*, 530 U.S. 327, 340–41 (2000); *Moskal v. United States*, 498 U.S. 103, 107–08 (1990). And here, the text is clear. "Shall" means "shall." *See Miller*, 530 U.S. at 337; *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998).

Worse yet, many circuits have fallen into the same error, with several adopting our reasoning. *See Rodriguez v. Bay State Corr. Ctr.*, 139 F.3d 270, 272 (1st Cir. 1998), *abrogated on other grounds by Bousley v. United States*, 523 U.S. 614 (1998); *Galtieri v. United States*, 128 F.3d 33, 37 (2d Cir. 1997), *overruled in part on other grounds by Magwood v. Patterson*, 561 U.S. 320 (2010); *In re Hoffner*, 870 F.3d 301, 307 n.11 (3d Cir. 2017); *In re Williams*, 330 F.3d 277, 280 (4th Cir. 2003); *Gray-Bey*, 201 F.3d at 867–68; *Ezell v. United States*, 778 F.3d 762, 765 (9th Cir. 2015); *Browning v. United States*, 241 F.3d 1262, 1263–64 (10th Cir. 2001) (en banc). As far as I can tell, only the Fifth and Eleventh Circuits treat the rule as mandatory. *In re Williams*, 898 F.3d 1098, 1102–03 (11th Cir. 2018) (Wilson, J., concurring) (discussing *In re Johnson*, 815 F.3d 733 (11th Cir. 2016) (en banc)); *In re White*, 602 F. App'x 954, 956 n.2 (5th Cir. 2015).

Though our circuit has treated the thirty-day rule as difficult to follow, it isn't. Congress gave us a simple task that should be easy to perform within thirty days: decide, using a prima facie standard, whether a petitioner is entitled to file a second or successive petition. 28 U.S.C.

§ 2244(b)(3)(C).  The criteria for filing a second or successive petition are spelled out right in AEDPA.  *Id.* § 2244(b)(1)–(2).  Because these conditions are difficult to meet, it's easy to judge whether they've been met.  *See id.*  Accordingly, we don't need an exhaustive opinion addressing the petition's merits.  *Id.* § 2244(b)(3)(C).

Indeed, AEDPA envisions that most second or successive petitions will be denied.  *Id.* § 2244(b)(2).  There are only two narrow exceptions.  *Id.* § 2244(b)(2)(A) (new, retroactive rule of constitutional law); *id.* § 2244(b)(2)(B) (newly discovered evidence so compelling that no rational juror would find the defendant guilty).  That's why most of these petitions are routinely denied in a brief order.  And because our denial is unappealable, that order ends the case.  *Id.* § 2244(b)(3)(E).

Even in the extraordinary case when a petitioner makes the prima facie showing, our order can be brief.  That's because AEDPA requires district courts to decide for themselves whether a petition meets AEDPA's stringent filing requirements.  *Id.* § 2244(b)(4).  And because our decision to let a petitioner file a second or successive petition isn't even binding on the district court, there's little reason for a panel to write more than a few pages.

It should be easy to perform this narrow, gatekeeping function within thirty days, especially when our decision isn't binding or subject to later review.  But even if not, we could adopt procedures to ensure we meet the deadline.  We could start by expediting the briefing.  If, for some reason, a panel needs to write more than a brief order, it could issue an order within thirty days and release an opinion later.  *See Galtieri*, 128 F.3d at 37.  Or, true to the expectation implicit in AEDPA's text, we could develop a default rule that motions are automatically denied after thirty days.  *See Gray-Bey*, 201 F.3d at 873 (Easterbrook, J., dissenting); 28 U.S.C. § 2244(b)(2).

In fact, we've already test run a procedure to ensure compliance with the thirty-day rule. In 1996, our circuit relied on staff attorneys to draft proposed orders, and we'd wait to start the thirty-day clock until the motion and draft order were submitted to a panel.  *In re Sims*, 111 F.3d 45, 48 n.1 (6th Cir. 1997).  Unfortunately, that procedure conflicted with the text just as much as

blowing past the deadline:  AEDPA gives us thirty days from "the filing of the motion," not from the submission of a proposed order.  28 U.S.C. § 2244(b)(3)(D).

Whatever procedure we choose, the point is that we must comply with the thirty-day rule. That rule is anything but "advisory or hortatory."  *Cf. Siggers*, 132 F.3d at 335.

II.

Why does the thirty-day rule matter?  First, Congress made it mandatory, and that should be good enough for us.  But also, the rule reflects the careful balance that Congress struck when enacting AEDPA.

Habeas plays "a vital role in protecting constitutional rights."  *Slack v. McDaniel*, 529 U.S. 473, 483 (2000).  But AEDPA balances this role against at least three concerns:  finality of state convictions, abuse of habeas, and delay.  *See Woodford v. Garceau*, 538 U.S. 202, 206 (2003) (quoting *Terry Williams v. Taylor*, 529 U.S. 362, 386 (2000) (opinion of Stevens, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible.")).  First, because habeas is a last-ditch challenge to another sovereign's conviction, AEDPA indulges a strong presumption that the conviction will be upheld.  28 U.S.C. § 2244(b)(2), 2254(d).  This furthers "comity, finality, and federalism." *Michael Williams v. Taylor*, 529 U.S. 420, 436 (2000).  Second, because federal habeas comes after several rounds of review, AEDPA limits habeas to the most compelling cases.  28 U.S.C. § 2254(b)(2).  This protects petitioners, for "[i]t must prejudice the occasional meritorious application to be buried in a flood of worthless ones." *Brown v. Allen*, 344 U.S. 443, 537 (1953) (Jackson, J., concurring in judgment).  Finally, because delays keep states, victims, and petitioners "in limbo," AEDPA demands that petitions be resolved quickly.  28 U.S.C. §§ 2244(b)(3)(D), (d)(1); *Baze v. Rees*, 553 U.S. 35, 81 n.17 (2008) (Stevens, J., concurring) (quotation omitted) (noting victims' families are "left in limbo," to relive a crime "for decades"); *Knight v. Florida*, 528 U.S. 990, 990 (1999) (Breyer, J., dissenting from denial of cert) (stating that long delays are "inhuman, degrading, or unusually cruel" for the prisoner).  These concerns are weighty, and AEDPA's balance is "delicate." *Michael Williams*, 529 U.S. at 436.

The thirty-day rule is integral to this balance. It furthers federalism and finality by keeping us from meddling in another sovereign's conviction for longer than necessary. Because second or successive petitions are the last stage in a long review process (thirty-seven years here), the thirty-day rule has us decide quickly whether to let petitioners file them, curbing abuse and focusing us on the petitions most likely to be meritorious. And, most obviously, the thirty-day rule also prevents delay. Indeed, even the legislative record confirms that AEPDA's deadlines are essential to the statute's purpose: to solve "the acute problem[] of unnecessary delay," a committee report explained, "[c]ourts are directed" to decide petitions "within specified time periods." H.R. Report 104-518, at 111 (Apr. 15, 1996).

We have neither the authority nor the expertise to second-guess AEDPA's delicate balance. And we don't have discretion to upset the balance by disregarding one of the statute's key components. But treating the thirty-day rule as "advisory or hortatory" does just that. *Cf. Siggers*, 132 F.3d at 335.

\*         \*         \*

This case has gone on for thirty-seven years. But AEDPA, correctly understood, ensures that it will not go on forever. Our court should honor—not ignore—the balance Congress struck in the thirty-day rule.

---

**DISSENT**

---

CLAY, Circuit Judge, dissenting.  Danny Hill was tried on capital charges in 1986.  Hill was convicted and sentenced to death, and his subsequent direct appeals and post-conviction proceedings were unsuccessful.  Decades later, based on a discovery in forensic science, Hill moved for a new trial in Ohio state court.  He was denied relief and now seeks to file a habeas corpus petition challenging the admission of recently debunked bitemark evidence at his trial and the state court's subsequent denial of his motion for a new trial as a denial of due process.  The sole issue before the en banc court is whether Hill's proposed habeas petition is "second or successive" under 28 U.S.C. § 2244(b).  Hill's habeas petition is not second or successive and should be remanded to the district court.  I therefore respectfully dissent.

**BACKGROUND**

The majority's recitation of the facts presented by this case is in many ways misleading.  Hopefully, the following description of the factual background of the case will place the relevant events in proper perspective.

Hill's trial began before a three-judge state-court panel in 1986.  *See State v. Hill*, 595 N.E.2d 884, 889 (Ohio 1992) ("*Hill II*").  The prosecution argued that Hill had actively participated in the rape, murder, and other offenses committed against Raymond Fife.  *Id.*  The majority's version of facts would lead the reader to believe that Hill was the primary perpetrator in the offenses committed against Fife.  However, Tim Combs, now deceased, according to Hill's confession, "did everything to the victim."[1]  *Id.* at 888.  Hill, who was 18 years old at the time of the offense, merely admitted he was present during the commission of the offense.  *Id.*  The critical evidence in proving that Hill was more than a spectator to these attacks was Dr.

---

[1]Combs was sentenced to multiple life imprisonments and not death, even though he was convicted of the same crime as Hill and considered the "principal offender."  *Hill II*, 595 N.E.2d at n.1; *see State v. Combs,* 162 Ohio App.3d 706, 708 (Ohio Ct. App. 2005).

Curtis Mertz's testimony at trial that Hill had left a bite mark on Fife's penis.**2**  *Id.* at 889.  Dr. Mertz, now deceased, was then an influential forensic odontologist who had previously served as the president of American Board of Forensic Odontology (ABFO), a membership-based organization formed in 1976 that issues guidelines for the collection, analysis, and reporting of bite mark evidence.  *See* National Academy of Sciences, Strengthening Forensic Science in the United States: A Path Forward 173 (2009) ["NAS Report"]**3**; American Board of Forensic Odontology, *About the ABFO*, https://abfo.org/ (last accessed August 1, 2023).

In his opening statement, the prosecutor previewed that Dr. Mertz would identify Hill as the person who had left a purported bite mark on Fife's penis.  Dr. Mertz then testified that it was his "professional opinion, with reasonable degree of medical certainty, that Hill's teeth, as depicted by the models and the photographs that [Dr. Mertz] had, made the bite on Fife's penis." *Hill II*, 595 N.E.2d at 889.  The prosecutor returned to Dr. Mertz's testimony in his closing statement, emphasizing that the evidence showed that Hill, not Combs, had left the supposed bite mark on Fife.  Hill was ultimately convicted of kidnapping, rape, aggravated arson, felonious sexual penetration, and aggravated murder with specifications, and was sentenced to death.  *Id.*

At the time of trial, Dr. Mertz's testimony fell within acceptable limits set by the ABFO. In 1986, and indeed until 2013, ABFO guidelines permitted odontologists like Dr. Mertz to relate, "to a reasonable degree of dental certainty," a "suspected biter to a bite mark."  *See* 2012 ABFO Guidelines, R. 1-12, Page ID #432.  This meant that odontologists could, consistent with best practices, testify that a person was "the biter," "the probable biter," "not excluded as the biter," or "excluded as the biter," or that it was "inconclusive" whether the person was or was not the biter.  *Id.*  The ABFO guidelines, of course, did not resolve whether a suspected "biter" had left a given bite mark, but the guidelines endorsed the prevailing belief that odontologists were capable of accurately and reliably identifying who had left a particular bite mark.  *See id.*

---

**2**The majority highlights the weakness of its argument by focusing on prior rape allegations against Hill and the horrendous nature of the crime, instead of confining its discussion to the legal issues presented. Furthermore, although the majority claims that Hill may have committed other rapes, that allegation purportedly is based on less than credible witness testimony.

**3**Available at:  https://www.ojp.gov/pdffiles1/nij/grants/228091.pdf.

Dr. Mertz's identification of Hill as the bite mark contributor was thus consistent with the contemporaneous view of odontologists' abilities.

More than two decades after Hill was sentenced to death and had begun pursuing his initial round of collateral relief, forensic science underwent a seismic shift. In 2009, the National Academy of Sciences (NAS) published a landmark report concluding that a wide swath of forensic evidence routinely introduced in criminal trials lacked sufficient support to be scientifically valid. *See* NAS Report, *supra*, at 4–8. Odontology shared many of the shortcomings that pervaded other forensic disciplines. Critically, odontologists had not "establish[ed] the uniqueness of bite marks" and thus lacked a valid basis to make conclusive bite mark identifications. *Id*. at 174. The ABFO guidelines exacerbated the issue. The guidelines failed to provide criteria for determining "whether the bite mark can be related to a person's dentition and with what degree of probability." *Id.* The report stated that "[e]ven when using the guidelines, different experts provide widely differing results and a high percentage of false positive matches of bite marks using controlled comparison studies." *Id.* The unreliability of bite mark evidence is compounded, according to the report, because "second expert[s] are not widely used" and because, "[b]ite marks often are associated with highly sensationalized and prejudicial cases, and there can be a great deal of pressure on the examining expert to match a bite mark to a suspect." *Id.* at 175. The NAS report concluded that there was no known "evidence of an existing scientific basis for identifying an individual to the exclusion of all others" and that further "research [was] warranted in order to identify the circumstances within which the methods of forensic odontology can provide probative value." *Id.* at 176.

The ABFO responded by substantially limiting the scope of acceptable bite mark identification testimony. In 2013, the ABFO issued amended guidelines that continued to permit odontologists to relate a suspected biter to a bite mark, but warned that the ABFO no longer "support[ed] a conclusion of 'the biter' in an open population case"—which is to say, where the universe or total number of possible bite mark contributors is unknown. 2013 ABFO Guidelines, R. 1-12, Page ID #434. The ABFO set even more restrictive limitations in 2016, this time amending its guidelines to preclude odontologists from making conclusive bite mark

identifications—beyond a broad claim that an individual could not be eliminated as a potential biter—in *any* cases, open population or not.

Given the substantially limited scope of the 2013 ABFO guidelines and their successors, were Dr. Mertz to have testified in accordance with these guidelines, he would have been precluded from identifying Hill as the person responsible for the alleged bite mark found on Fife. Had Hill been tried in 2013 or in the decade since, any odontologist called on to identify Hill as the source of Fife's purported bite mark, notwithstanding the ABFO guidelines that preclude such a determination, would have had to confront during cross-examination the widespread consensus that such testimony is unsupportable and unscientific—in the unlikely event that the odontologist were permitted to testify at all. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) (imposing an obligation on a trial judge to "ensure that any and all scientific testimony . . . is not only relevant, but reliable).

In 2014, Hill brought these scientific developments to the attention of an Ohio trial court when he moved for leave to file a delayed motion for a new trial under Ohio Rule of Criminal Procedure 33(B). Hill asserted in the motion that the revised ABFO guidelines constituted new evidence demonstrating that the bite mark identification evidence used at his trial was invalid, and that he was convicted in violation of his Fifth, Eighth, and Fourteenth Amendment rights. The state trial court found that Hill was unavoidably delayed in discovering his new evidence because the ABFO guidelines were not in existence at the time of his trial and granted Hill permission to file a motion for a new trial.

Hill filed his motion for a new trial in June 2016. In it, he recounted the scientific discoveries made since Dr. Mertz took the stand in 1986. He also submitted an affidavit from forensic odontologist Dr. Franklin Wright, another former president of the ABFO who had reviewed the evidence from Hill's trial. Based on his examination, Dr. Wright concluded that Fife's injury was "not a human bite mark." 2014 Wright Aff., R. 1-4, Page ID #368. Dr. Wright further opined that even ignoring his finding that the injury was not a human bite mark, Dr. Mertz's finding was not scientifically supportable because "[i]t is not possible to determine from the evidence" presented at Hill's trial that Fife's injury "was created by [Hill] to the exclusion of millions of other individuals in the open universe of possible biters." *Id.*, Page ID #368.

The state trial court found that advances in forensic odontology impeached and contradicted the trial testimony that marks on Fife could be linked to Hill. But the trial court held that it was bound by the Ohio Supreme Court's findings on the sufficiency of the evidence of aggravated murder and its independent weighing of the sufficiency of the rape, kidnapping, and aggravated arson specifications. The trial court concluded that, even if the bite mark evidence were excluded, there was no probability of a different outcome in a new trial because there was overwhelming evidence in support of Hill's convictions for the kidnapping specification. The Ohio Court of Appeals affirmed, *State v. Hill* ("*Hill VI*"), 125 N.E.3d 158 (Ohio Ct. App. 2018), and the Ohio Supreme Court denied further review, *State v. Hill* ("*Hill VIII*"), 123 N.E.3d 1040 (Ohio 2019) (table), *cert. denied*, 140 S. Ct. 884 (2020).

Hill filed a habeas petition under § 2254 in the district court. He alleged that Ohio Rule of Criminal Procedure 33 created a liberty interest under the Fourteenth Amendment, and that the state trial court violated his due-process rights by not conducting an appropriate materiality review of his new evidence as required under Rule 33. He further asserted that the Ohio Court of Appeals did not properly analyze his due-process claims and made factual and legal errors. Hill concluded that the state courts' failure to follow the established process for reviewing his claim violated his constitutional right to due process and a fair proceeding and was an unreasonable application of clearly established federal law and an unreasonable application of the facts.

The district court found that Hill's habeas petition was second or successive and transferred it to this court. A panel of this court held that Hill's petition was second in time but not second or successive, and transferred it back to the district court for further proceedings. *In re Hill*, No. 20-3863, 2022 WL 19222585 (6th Cir. Aug. 30, 2022) (order), *reh'g en banc granted, opinion vacated*, 62 F.4th 1039 (6th Cir. 2023) (order). The State petitioned for rehearing en banc, which the en banc court granted. 62 F.4th 1039.

**DISCUSSION**

As the majority correctly identifies, we review de novo whether Hill's petition is "second or successive." *See Lang v. United States*, 474 F.3d 348, 351 (6th Cir. 2007).

Hill claims that his conviction and sentence violated the Constitution because the prosecution relied on bite mark evidence that was discredited as scientifically unreliable in 2013 and 2016, and the Ohio state courts violated his due process rights by failing to follow established procedures when adjudicating his motion for a new trial. Hill seeks to raise that claim in a habeas petition under § 2254. The issue is whether he must satisfy § 2244(b)(2)'s gatekeeping requirements before he may file his petition in the district court. Because Hill's petition is merely second in time, not "second or successive," the petition is not governed by § 2244(b) and Hill may file the petition directly in the district court.

Section 2244(b) limits the ability of habeas petitioners to file second or successive habeas petitions. *See* 28 U.S.C. § 2244(b). Although Hill filed an initial habeas petition in 1996 and seeks to file a second petition now, the Supreme Court has repeatedly affirmed that a habeas petition is not "second or successive" merely because it was "filed second or successively in time[.]" *Magwood v. Patterson*, 561 U.S. 320, 332 (2010) (quoting *Panetti v. Quarterman*, 551 U.S. 930, 944 (2007)); *see also In re Cook*, 215 F.3d 606, 607 (6th Cir. 2000) (order) ("[T]he fact that [the defendant] has already filed one § 2254 application . . . is not necessarily determinative of whether the current attempt is a 'second or successive' application."). Indeed, the Supreme Court has "declined to interpret 'second or successive' as referring to all § 2254 applications filed second in time, even when the later filings address a state-court judgment already challenged in a prior § 2254 application." *Panetti*, 551 U.S. at 944 (citing *Slack v. McDaniel*, 529 U.S. 473, 486–87 (2000)); *Stewart v. Martinez-Villareal*, 523 U.S. 637, 645 (1998)).

The ripeness of a defendant's argument at the time of his initial petition is critical in determining whether a claim presented in a second habeas petition is considered second in time, or instead second and successive. In *Panetti*, the Supreme Court considered how to categorize a petitioner's second habeas petition that raised a competency claim under *Ford v. Wainwright*,

477 U.S. 399 (1986), whereby the petitioner's "first federal habeas application, which was fully and finally adjudicated on the merits, [had] failed to raise a *Ford* claim." *Id.* at 942 (citation and quotation marks omitted). The Court found that the defendant's claim was second in time, not second and successive, notwithstanding the petitioner's failure to raise a *Ford* claim in his first petition, because the petitioner filed his "Ford-based incompetency claim . . . as soon as that claim [became] ripe." *Id.* at 945; s*ee also Martinez-Villareal*, 523 U.S. at 643–46 (holding that a *Ford* claim, raised for the second time after petitioner's first claim was dismissed as premature, was not a "second or successive" petition under § 2244(b)). Our Court has applied *Panetti* outside the context of a *Ford* claim, including in *In re Salem*, where we held that the defendant's entrapment claim was not ripe at the time of the initial petition, and "should therefore be treated as a continuation of [the defendant's] earlier, undoubtedly reviewable, application for federal habeas relief." 631 F.3d 809, 813 (6th Cir. 2011) (quoting *Martinez-Villareal*, 523 U.S. at 643). The majority agrees that a claim not ripe at the time of an initial petition is not second and successive, but for inexplicable reasons finds that Hill's petition is nonetheless "second or successive."

When determining whether a habeas petition is second or successive, the Supreme Court and this court have "looked for guidance in two main places." *Banister v. Davis,* 140 S. Ct. 1698, 1705 (2020). First, the courts have considered whether the habeas petition would have historically "constituted an abuse of the writ, as that concept is explained in [the Supreme Court's] [pre-Antiterrorism and Effective Death Penalty Act (AEDPA)] cases." *Id.* at 1706 (quoting *Panetti*, 551 U.S. at 947). "If so, it is successive; if not, likely not." *Id*. Second, the courts have looked to the purposes of AEDPA, including "conser[ving] judicial resources, reduc[ing] piecemeal litigation, [and] streamlin[ing] federal habeas proceedings."[4] *Panetti*, 551 U.S. at 946.

Hill's petition does not constitute an abuse of the writ. A petitioner abuses the writ "by raising a claim in a subsequent petition that he could have raised in his first, regardless of

---

[4]The majority unnecessarily delves into a distinction between judgments and claims in relation to § 2244(b). Hill's petition is not "second and successive" even accepting the majority's view that the petition is based on a purported "new claim."

whether the failure to raise it earlier stemmed from a deliberate choice." *McCleskey v. Zant*, 499 U.S. 467, 489 (1991). This court has previously held that a claim that could have been raised in an earlier petition but was not, either because the petitioner chose not to, or because the petitioner was not aware of existing facts supporting the claim, is "second or successive" under § 2244(b). *See* 28 U.S.C. § 2244(b)(2)(B)(i); *In re Wogenstahl*, 902 F.3d 621, 627–28 (6th Cir. 2018). By contrast, a petitioner does not abuse the writ by raising a claim that would have been unripe if it had been presented in an earlier petition. *Panetti*, 551 U.S. at 945. Such is the case where "the events giving rise to the claim had not yet occurred" when the petitioner filed his earlier habeas petition. *In re Jones*, 652 F.3d 603, 605 (6th Cir. 2010). The majority opines that Hill's new claim was ripe during his initial habeas petition because the bite mark evidence was presented during trial and was appealable from that moment on. This is a fundamental misunderstanding of Hill's claim.

Hill's claim arises out of events that occurred decades after he filed his first federal habeas petition in 1996. His claim arose in 2013 and continued into 2016, when the scientific community repudiated the bitemark evidence offered at his trial and the ABFO revised its guidelines to account for that scientific revolution. Prior to those developments, Dr. Mertz's testimony "fell within acceptable limits" set by the ABFO and subscribed to by odontologists. 2020 Wright Decl., R. 1-11, Page ID #410. After the change, his testimony was deemed by the relevant scientific community to lack a valid scientific basis. Given the timing of these events, Hill could not have brought his claim in his initial petition. Hill was aware of the bite mark evidence during his trial; however, his claim disputing the reliability of the evidence was not ripe until the scientific community invalidated the evidence.

Further, the majority claims its opinion preserves AEDPA's objectives, because Hill could have brought his bite mark claim in his initial petition, which would have streamlined his proceedings. However, it makes little sense to demand that Hill argue that bite mark identification lacked a scientific basis at a time when bite mark identification was still widely considered to be a valid form of forensic evidence, solely on the off chance that the science might eventually change. *Cf. Panetti*, 551 U.S. at 946 (finding that "[a]n empty formality requiring prisoners to file unripe *Ford* claims neither respects the limited legal resources

available to the States nor encourages the exhaustion of state remedies"). Rather, allowing Hill to raise his claim in a second-in-time habeas petition once the scientific community reached its consensus and his claim became ripe serves a greater judicial purpose, and is not contrary to the purposes of the AEDPA. *See id.*; *see also Jones*, 652 F.3d at 605.

Moreover, beyond placing an impossible standard on defendants that requires defendants to predict scientific discoveries in their initial petition, the majority also directly flouts this Circuit's and the Supreme Court's precedent. Hill's inability to challenge the bite mark evidence before the evidence was scientifically discredited is directly comparable to a petitioner's inability to challenge an execution that has not yet been set, *Martinez-Villareal*, 523 U.S. at 644–45, or laws that have not yet been passed, *Jones*, 652 F.3d at 605.

In particular, Hill's claim in this case is directly analogous to a claim presented in *Jones*. In *Jones*, the petitioner moved for authorization to file a second or successive habeas petition based in part on his claim that changes to Michigan's parole system since his conviction constituted an ex post facto law. *Jones*, 652 F.3d at 604. Jones' "*ex post facto* claim . . . challenge[d] the cumulative effect of amendments to Michigan's parole system, the last of which took effect . . . two years after Jones's initial habeas petition was filed." *Id.* at 605. Given the timing of these events, this Court held that Jones's claim was "unripe when his initial petition was filed" and that his claim was therefore second in time rather than second or successive. *Id.*

Like the newly enacted change to Michigan's parole system which rendered Jones' petition second in time, the seismic shift in forensic odontology and newly formed scientific consensus that such evidence lacks validity renders Hill's petition second in time, and not second or successive. As the *Jones* Court held, "no useful purpose would be served by requiring prisoners to file *ex post facto* claims in their initial petition as a matter of course, in order to leave open the chance of reviving their challenges in the event that subsequent changes to the [law] create an *ex post facto* violation." *Id.* Similarly, no useful purpose would have been served by requiring Hill to file his claim challenging the scientific validity of the bite mark evidence in his initial petition, to then lose on the basis that no scientific evidence supported his claim. Just as we do not require petitioners to predict changes in the law, we should not require petitioners to predict changes in science. The majority's repeated assertion that Hill could have brought this

claim initially is misguided, and would have required Hill to mount a scientific challenge that was not supported by the scientific evidence available at that time. In view of such enormously consequential errors, this Court should acknowledge that Hill's petition is merely second in time, not second or successive, and hold that § 2244(b) does not apply to Hill's petition.

While the majority agrees that Jones' ex post facto claim was second in time, the majority attempts to argue that a second claim brought by Jones, which the *Jones* Court held was second or successive, is more analogous to Hill's petition. Jones' second claim "contend[ed] that the jury pool at his trial systematically excluded African-Americans, in violation of the Sixth Amendment's fair cross-section requirement." *Id.* at 604. Because Jones' claim "challenge[d] events that occurred at his trial," the *Jones* Court found that the claim fell "squarely within the scope of § 2244(b)." *Id.* at 606. Attempting to analogize, the majority opines that Hill's bite-mark claim, like Jones' cross-section claim, challenges events that occurred at his trial, and thus must pass the gatekeeping provisions of § 2244(b).

The majority is plainly wrong. In bringing his cross-section jury claim, Jones alleged no new discovery or new law that changed the legal landscape regarding jury selection practices—thus Jones' jury claim was ripe at the time Jones brought his first petition. Clearly, Jones' cross-section jury claim is completely unlike Hill's claim, which is based on new scientific evidence that did not exist when Hill filed his initial petition—new scientific evidence that *completely* invalidates the bite mark evidence—and therefore was unripe at the time of the initial petition.

Further, the majority insists that "the factual predicates for the claim occurred at trial," thus any claim that is a derivative of those factual predicates would necessarily be "second and successive" if not brought in the initial petition—relying on *Wogenstahl*, 902 F.3d at 627–28, in which a *Brady* violation had occurred but the petitioner did not learn of it until later. *See Brady v. Maryland*, 373 U.S. 83 (1963). However, unlike in *Wogenstahl*, the factual predicate for Hill's claim did not exist at the time he filed his first habeas petition: it was not until the scientific community repudiated the odontological evidence introduced at Hill's trial, and the ABFO manual was later reissued, that Hill's claim became ripe. In other words, if Wogenstahl had access to all then-available information at the time of his first habeas petition, he could have

brought a *Brady* claim. In contrast, if Hill had access to all then-available information at the time of his first habeas petition, he still could not have brought a viable claim that the bite mark evidence was invalid because the evidence had not yet been repudiated, the prior ABFO guidelines still controlled, and his argument would have been contrary to the prevailing scientific consensus.

The majority also points to out-of-circuit cases in which courts have "assumed" that claims based on newly existing evidence are "second or successive." Critically, these cases do not analyze whether the petitions are "second or successive." *See Rhodes v. Smith*, 950 F.3d 1032, 1036 (8th Cir. 2020) (noting that the only question raised on appeal was whether the district court erred in holding that the petitioner failed to satisfy the § 2244(b) requirements); *Feather v. United States*, 18 F.4th 982, 985 (8th Cir. 2021) (treating the § 2255 motion as an initial petition and reviewing it on its merits); *Case v. Hatch*, 731 F.3d 1015, 1026 (10th Cir. 2013) (assuming without analysis that the § 2254 application was "second or successive"). Thus, these cases shed no light on the question presented to the Court in this case.

To be clear, the only issue before the en banc court is whether Hill's proposed habeas petition is second or successive under § 2244(b). The merits of Hill's challenge to the state trial court's decision, the strength of the evidence he has introduced, and all other matters bearing on the merits of his claim are irrelevant to that issue and are not before the en banc court. Even taking the merits into account, however, the majority grossly overstates and overestimates the evidence against Hill that would qualify him for the death penalty. As described above, the bite mark evidence is paramount in determining the level of Hill's participation in the offense. Likewise, the amount of time that has passed since Hill was convicted and sentenced should have no bearing on the en banc court's determination. Those considerations are already reflected in the limitations § 2244(b) places on second or successive habeas petitions and in the Supreme Court's decisions interpreting the provision. Hill did not unduly delay his claim, as the invalidating evidence did not come to light until 2013. Nor should Hill's efforts to litigate his other claims, which have generated substantial judicial disagreement, influence the Court's decision here.

The en banc court should not alter the balance Congress and the Court have struck. Because the majority's approach cannot be reconciled with more than two decades of Supreme Court precedent recognizing that a second-in-time habeas petition is not second or successive when the petitioner could not have "receive[d] an adjudication of his claim" when he filed his earlier petition, *Martinez-Villareal*, 523 U.S. at 645, the majority's approach is grievously misguided.

For the aforementioned reasons, Hill's habeas petition is second in time but not second or successive, and should therefore be remanded to the district court for further proceedings as a second in time petition. Because the majority declines to follow that straightforward procedure based on its misreading of precedent and its mischaracterization of Hill's claim, I respectfully dissent.